DIAZ, Circuit Judge:
After enduring years of domestic abuse at the hands of her husband, a Peruvian National Police Officer, Sonia Calla Mejia fled her native Peru and entered the United States illegally in April 2015. The Department of Homeland Security (“DHS”) detained Calla Mejia and, following a June 2015 hearing before an Immigration Judge (“U”) in Texas, removed her to Peru.
Months later, Calla Mejia attempted to re-enter the United States, and was again apprehended by DHS, which reinstated her previous removal order. When Calla Mejia sought asylum, DHS placed her in “withholding of removal-only” proceedings and deemed her ineligible to apply for asylum because of her reinstated removal order. An IJ in Maryland concluded that Calla Mejia was ineligible for asylum but granted her withholding of removal.
Before us, Calla Mejia contends that, irrespective of her status, she is entitled to apply for asylum under 8 U.S.C. § 1158, or, alternatively, because defects in the June 2015 proceedings render the underlying removal order invalid. The government counters that we lack jurisdiction over Calla Mejia’s appeal. On the merits, the government asserts that 8 U.S.C. § 1231(a)(5) categorically prohibits individuals with reinstated orders of removal from applying for asylum relief, and, alternatively, rejects Calla Mejia’s objections to the June 2015 hearing as meritless.
As we explain, we have jurisdiction to consider Calla Mejia’s statutory claim but not her challenges to the June 2015 remov-. al order. With respect to the statutory claim, we hold that Congress has directly spoken to the precise question at issue: an alien subject to a reinstated removal order—-like Calla Mejia—is precluded from applying for asylum. Accordingly, we dismiss Calla Mejia’s petition for review in part and deny the petition in part.
I.
The first time Calla Mejia fled Peru, she waded across the Rio Grande from Mexico into the United States, where she was apprehended by U.S. Customs & Border Patrol near Laredo, Texas. Calla Mejia told Border Patrol agents that she came to the United States to “reside and work in New York” for a period of five years.[1] A.R. 218.
*577 While in detention, Calla Mejia was referred to an asylum officer, who conducted a credible-fear interview. Calla Mejia informed the asylum officer that she had been threatened, brutally beaten, and raped by her husband for several years. She explained that when she reported his abuse to the police in Peru, “after [she] told them [her] husband was a police officer they just left [her] there waiting and they never helped [her].” A.R. 212. Calla Mejia told the asylum officer that she couldn’t live safely anywhere in Peru because her husband—using the investigative résources at his disposal as a police officer—would undoubtedly look for her and harm her. The asylum officer concluded that Calla Mejia had demonstrated a credible fear of returning to Peru and Calla Mejia was consequently placed-.in a full removal proceeding pursuant to 8 U.S.C. § 1229a.
After DHS served her with a Notice to Appear, Calla Mejia appeared pro se before an IJ in Texas. This June 2015 Master Calendar Hearing was consolidated with the hearings of seven other women and conducted by the IJ via videoconference.[2] Through a Spanish-language interpreter, the IJ advised the women of their rights in the removal proceedings, including their right to apply for asylum, withholding of removal, and protection under the Convention Against Torture. The IJ also spoke at length about credibility, explaining:
By now each of you have given at least two separate sworn statements. You gave one to the border patrol when you were apprehended and another to the asylum- officer. If those two statements are not consistent with each other you have a credibility problem. Credibility problems are extremely difficult to overcome under our law.
A.R. 556-57.
The IJ then addressed Calla Mejia individually. Calla Mejia confirmed that she understood her rights as explained. The IJ noted that Calla Mejia “told the second officer [she was] fearful of returning to [her] country,” but that, she “told the first officer [she was] going to live in New York for five years and [she was] not afraid to return.” A.R. 561-62. The IJ informed Calla Mejia, “if you want, to apply for asylum, withholding of removal and Convention Against Torture relief, I will allow it, but I should tell you, you have a credibility problem. A serious one.” A.R. 562. Calla Mejia subsequently declined to apply for relief, accepted the order of removal, and waived her right to appeal. The IJ issued a final order of removal, and Calla Mejia was removed to Peru on June 22,2015.
Once removed, Calla Mejia returned to her family home in Peru. Her husband soon learned that she was back, entered her family’s house, attacked her, and raped her. Calla Mejia then fled to the United States a second time, where she was immediately apprehended and detained by Border Patrol. Pursuant to 8 U.S.C. § 1231(a)(5), DHS reinstated Calla Mejia’s June 2015 order of removal.
Calla Mejia was subsequently transferred to a detention center in Maryland, where, after she expressed a fear of re *578 turning, to Peru, an asylum officer conducted a reasonable-fear interview. The asylum officer found that Calla Mejia credibly established a reasonable fear of persecution in Peru. But because Calla Mejia remained subject to a reinstated order of removal, DHS placed her in “withholding-only” proceedings. ■
' With the aid of counsel,' Calla Mejia filed a Form 1-589 applicatioii and supporting briefs asserting her eligibility for asylum, withholding of removal, and Convention Against Torture protection. Calla Mejia contended that despite her placement in withholding-only proceedings, she was statutorily eligible to apply for asylum. Alternatively, Calla Mejia argued that her original removal order was invalid due to constitutional defects in the June 2015 hearing in Texas.
Calla Mejia appeared before the IJ in February 2016. Her counsel urged that Calla Mejia was eligible to apply for asylum.[3] But the IJ responded that the reinstated removal order rendered Calla Mejia ineligible for asylum and concluded that she lacked the authority to consider the application for asylum. At that point, Calla Mejia’s counsel withdrew the application.
Calla Mejia testified regarding the domestic abuse she had suffered and her fear of returning to Peru. The IJ granted Calla Mejia’s application for withholding of removal, finding that Calla Mejia credibly established past persecution in the form of domestic violence, the Peruvian government’s inability or unwillingness to protect her, and her inability to relocate safely elsewhere in Peru. Calla Mejia and DHS waived appeal of the IJ’s ruling.
This petition for review followed.
II.
We begin with a brief overview of the relevant statutory provisions of the Immigration and Nationality Act (“INA”). Calla Mejia’s claim that she is entitled to seek asylum notwithstanding her reinstated' removal order centers on the relationship between two statutes: 8 U.S.C. § 1158, the asylum statute, and 8 U.S.C. § 1231(a)(5), the reinstatement bar. Before discussing these provisions, we first examine the distinction between withholding of removal, which the IJ granted to Calla Mejia in the February 2016 proceedings, and asylum, which Calla Mejia continues to seek.
A.
 Eligibility for the discretionary relief of asylum requires an alien to show that she is a “refugee,” or a person “unable or unwilling to return to” a country because she has a “well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. §' l-101(a)(42)(A) (defining the term “refugee”); 8 C.F.R. § 1208.13(b) (providing eligibility standard). Critically, “the Attorney General is not required to grant asylum to everyone who meets the definition of refugee.” INS v. Cardoza-Fonseca, 480 U.S. 421, 428 n.5, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Instead, “the decision whether asylum should be granted to an eligible alien is committed to the Attorney General’s discretion.” INS v. Aguirre-Aguirre, 526 U.S. 415, 420, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).
By contrast, “[i]f an applicant for withholding of removal establishes her claim, the Attorney General cannot remove her to her native country.” Anim v. *579 Mukasey, 535 F.3d 243, 252 (4th Cir. 2008) (internal quotation marks omitted). Accordingly, to obtain -withholding of removal, an alien must satisfy “a more demanding standard of proof than an asylum claim.” Id. She “must establish that if she was sent back to her home country, there is a clear probability .that her ‘life or freedom would be threatened ... because of [her] race, religion, nationality, membership in a particular social group, or political opinion.’ ” Id. at 252-53 (omission and alteration in original) (quoting 8 U.S.C. § 1231(b)(3)(A)); see also 8 C.F.R. § 1208.16(b).
Withholding of removal and asylum also differ with regard to the benefits granted to an alien. “[Ajsylum affords [aliens] broader benefits” than a grant of withholding of removal, including the opportunity for adjustment to lawful permanent resident status, and ultimately, citizenship. Cardoza-Fonseca, 480 U.S. at 428 n.6, 107 S.Ct. 1207. Asylees may also petition for derivative asylee status for certain family members. 8 C.F.R. § 1208.21. Moreover, while withholding of removal only prevents the removal of an alien to the specific country where she faces persecution—thereby leaving open the possibility of transfer to a third country, id. § 1208.16(f)—asylum prevents removal from the United States entirely. Finally, aliens granted withholding of removal are subject to a number of restrictions, including limitations on their ability to work in the United States, id. § 247a.l2(a)(10), and to travel internationally, id. § 241.7.
B.
As originally enacted, the asylum provision relied on by Calla Mejia granted “an alien ... irrespective of such alien’s status,” the right to apply for asylum. See Refugee Act of 1980, Pub. L. No. 96-212, § 208, 94 Stat. 102, 105. With the exception of a 1990 amendment that prohibited aliens convicted of an aggravated felony from applying for asylum, see Immigration Act of 1990, Pub. L. No. 101-649, § 515, 104 Stat. 4978, 5053, the text of the asylum provision remained largely unchanged until 1996, when Congress passed the Illegal Immigration Reform and Immigrant' Responsibility Act of 1996 (“IIRIRA”), Pub. L. No. 104-208,110 Stat. 3009-546. IIRIRA recodified the asylum provision at 8 U.S.C. § 1158 and reformatted it' into two sections: § 1158(a)(1), which now provides that “[a]ny alien ... 'irrespective of such alien’s status, may apply for asylum,” and § 1158(a)(2), which' enumerates certain classes of aliens who are ineligible to apply for asylum.
Specifically, as amended, the asylum provision now provides that individuals who could be removed to a “[s]afe third country,” § 1158(a)(2)(A), failed to timely apply for asylum, § 1158(a)(2)(B), or were previously denied asylum, § 1158(a)(2)(C), are statutorily ineligible to apply for asylum. Section 1158(a)(2)(D), however, sets out an exception to these exceptions: Notwithstanding a previous denial of asylum, an alien may apply for asylum if the. alien successfully demonstrates “the existence of changed circumstances which materially affect the applicant’s eligibility for asylum or extraordinary circumstances relating to the delay in filing an application.”
C.
In addition to revising § 1158, IIRIRA enacted § 1231(a)(5), which governs the reinstatement of removal orders. Before IIRIRA, aliens who illegally re-entered the United States after removal were placed in the same removal proceedings as those aliéns not subject to a previous removal order, affording them additional hearings before an IJ. See Fernandez-Vargas v. Gonzales, 548 U.S. 30, 34-35, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). Frustrated *580 with the duplicative nature of this existing process, Congress sought to “toe[ ] a harder line” with “illegal reentrants,” id., by-providing:
If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under [Chapter 12 of Title 8], and the alien shall be removed under the prior order at any time after the reentry.
8 U.S.C. § 1231(a)(5).
As such, IIRIRA enlarged the class of illegal reentrants subject to summary removal after reinstatement, “explicitly insulate[d] thefir] removal orders from review, and generally foreclose[d] discretionary relief from the terms of the reinstated order.” Fernandez-Vargas, 548 U.S. at 35, 126 S.Ct. 2422.
To effectuate § 1231(a)(5), the Attorney General promulgated 8 C.F.R. § 241.8. Typically, under this regulation, if an immigration officer determines: (1) “the alien has been subject to a prior order of removal”; (2) “the alien is in fact [the] alien who was previously removed”; and (3) “the alien unlawfully reentered the United States,” then the alien has no right to a hearing before an IJ, and shall be summarily removed under the prior order. 8 C.F.R. § 241.8(a)-(c). However, the regulation provides an exception for an alien who expresses a fear of returning to the country designated in the reinstated removal order: under 8 C.F.R. § 241.8(e), “the alien shall be immediately referred to an asylum officer for an interview to determine whether the alien has a reasonable fear of persecution or torture.” If an asylum officer concludes that the alien has a “reasonable fear of persecution or torture,” the case is referred to an IJ “for full consideration of the request for withholding of removal only.” 8 C.F.R. § 1208.31(e).[4] Appeal of the IJ’s decision as to tjie request for withholding of removal lies with the Board of Immigration Appeals (“BIA”). Id. A separate regulation permits an individual subject to a reinstated removal order to also seek protection under the Convention Against Torture. Id. § 1208.16(c)(4).
III.
Calla Mejia maintains that the statutory language of the asylum provision, § 1158(a)(1),'gives her the right to apply for asylum irrespective of her status. In the alternative, Calla Mejia argues that constitutional and statutory defects in the June 2015 hearing render the underlying removal order invalid. She seeks, on either ground, adjudication of her asylum application on the merits.
A.
1.
As a threshold matter, we must determine our jurisdiction over Calla Mejia’s statutory claim, a question of law that we consider de novo. Kporlor v. Holder, 597 F.3d 222, 225 (4th Cir. 2010). The government has moved to dismiss Calla Mejia’s petition, premised in part on the ground that Calla Mejia failed to administratively exhaust her asylum-eligibility claim before the IJ and BIA. In response, Calla Mejia urges that, under the existing statutory *581 and regulatory scheme, she had no forum to litigate her asylum claim and therefore satisfactorily exhausted the remedies available to her. We agree -with Calla Mejia. Specifically, we conclude that we have jurisdiction to hear Calla Mejia’s petition because she had no avenue “as of right” to assert. her entitlement to asylum while placed in withholding-only proceedings.
Under the INA, an alien must exhaust “all administrative remedies available to the alien as of right” before filing a petition for review of a final order of removal. 8 U.S.C. § 1252(d)(1) (emphasis added). “When an alien has an opportunity to raise a claim in administrative proceedings but does not do so, he fails to exhaust his administrative remedies as to that claim.” Etienne v. Lynch, 813 F.3d 135, 138 (4th Cir. 2015). Notwithstanding this rule, we’ve recognized that the INA’s administrative-exhaustion requirement doesn’t deprive us of jurisdiction to consider in the first instance an alien’s claim where “the relevant statutes and corresponding regulations [do] not provide the alien with an avenue” to lodge her challenge. Id. at 140' (alterations omitted) (quoting Valdiviez-Hernandez v. Holder, 739 F.3d 184, 187 (5th Cir. 2013)).
Our reasoning in Etienne is instructive. In that case, we considered whether we had jurisdiction to hear an alien’s legal challenges to his removal where the alien failed to raise them in the DHS expedited removal proceedings. Id. at 138. The government contended that we lacked jurisdiction because the alien failed to exhaust his administrative remedies pursuant to § 1252(d)(1). Id. After examining DHS regulations and applicable agency forms— which “h[eld] out” to aliens in expedited removal proceedings only the opportunity to lodge factual challenges to removal—we rejected the government’s argument. Id. at 141-42. Reasoning that “[ejxhaustion of administrative remedies means using all steps that the agency holds out, and doing so properly,” we concluded that the alien wasn’t required to raise his legal challenges to removal before DHS to satisfy § 1252(d)(1). Id. at 141 (alterations omitted) (quoting Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).
As an alien subject to a reinstated removal order, Calla Mejia likewise had no avenue to assert her statutory claim of entitlement to asylum before the IJ and BIA because, under existing DHS regulations, she was entitled “as of right” to seek only withholding of removal. See 8 C.F.R. §§ 241.8(e), 1208.31(e). Once an asylum officer finds that an alien has shown a reasonable fear of persecution or torture, the agency holds out to individuals subject to a reinstated order of removal a hearing before an IJ and possible appeal to the BIA “for withholding of removal only.” Id. § 1208.31(e) (emphasis added).
Contrary to the view of the dissent, the mere opportunity to mention a.claim in administrative proceedings is not the same as having an avenue “as of right” to do so. The dissent makes much of the fact that Calla Mejia filed before the IJ a Form I-589 Application for Asylum and asserts that the BIA could have decided the legal arguments she raised as to her entitlement. But our colleague ignores that DHS regulations expressly limit Calla Mejia from seeking anything other than withholding of removal. While the IJ and BIA could listen to Calla Mejia’s statutory claim, the regulations are clear that asylum is unavailable to her in the administrative proceedings. An opinion written by the IJ and BIA to that effect—no matter how carefully considered—does not change the fact that Calla Mejia had no “avenue” to assert her entitlement to asylum in proceedings reserved for seeking withholding of removal.
*582 Moreover, we can readily dispel the government’s suggestion that administrative relief was available to Calla Mejia because the Attorney General, pursuant to 8 C.F.R. § 1003.1(h)(1), could have reviewed her case and potentially rescinded the regulation that foreclosed her eligibility .to apply for asylum. The regulation provides that the Attorney General may be referred a case from the BIA in only three ways: (1) if the Attorney General directs the referral; (2) if the Chairman or majority of the BIA believes the case should be referred; or (3) if the Secretary of Homeland Security . directs the referral. 8 C.F.R. §' 1003.1(h)(l)(i)—(iii)l Calla Mejia therefore could not. have triggered the Attorney General’s review of her case.
Thus, because controlling DHS .regulations limit individuals like Calla Mejia to seeking only “full consideration of [their] request for withholding of removal,” id., we conclude that Calla Mejia exhausted all administrative remedies available to her “as of right” pursuant to 8 Ú.S.C. § 1252(d)(1).[5] The government also contends that Calla Mejia waived her statutory claim because she withdrew her motion 'to apply for asylum when the IJ granted her application for. withholding of removal and because she didn’t appeal to the BIA. Although “[g]enerally, any claim not raised before the BIA is waived[,] ... .a claim is not waived whén it would be futile to raise it.” Selgeka v. Carroll, 184 F.3d 337, 345 (4th Cir. 1999).[6] Calla Mejia’s asylum claim falls within this futility exception because the BIA—bound to follow DHS regulations and without authority to overturn them— applies 8 C.F.R. § 1208.31(e) to preclude individuals subject to a reinstated reriioval order from applying for asylum. See Orquera v. Ashcroft, 357 F.3d 413, 424 n.8 (4th Cir. 2003) (observing that where adjudicar tive administrative body lacked power to invalidate an INS regulation as unconstitutional or contrary to the authorizing statute, “raising] these arguments with the [adjudicative body] would have been futile” (citing Selgeka, 184 F.3d at 345)).
The government acknowledges that the BIA would have applied the regulation and dismissed Calla Mejia’s appeal as to her asylum claim, but contends that Calla Mejia should have appealed to the.BIA nonetheless. The.fact remains, however, that having been granted the only remedy available to her under the statutory and regulatory scheme, any'attempt by Calla Mejia to seek asylum before the BIA would have been fruitless. Moreover, doing as the government suggests would have required Calla Mejia to .remain detained while awaiting the BIA’s inevitable application of DHS regulations and subsequent dismissal of her appeal for asylum. We won’t countenance such a pointless endeav- or.
*583 Having determined that we have jurisdiction over Calla Mejia’s statutory claim for asylum, we turn to the merits.
2.
Calla Mejia’s petition challenges the validity of the agency’s interpretation of the reinstatement bar to preclude individuals subject to reinstated removal orders from applying for asylum. To resolve this issue of statutory construction, we apply the familiar two-step framework prescribed by Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). “At Chevron’s, first step, we examine the statute’s plain language; if Congress has spoken clearly on the precise- question at issue, the statutory language controls.” Ojo v. Lynch, 813 F.3d 533, 538-39 (4th Cir. 2016) (internal quotation marks omitted). In conducting this inquiry, “we employ the traditional rules of statutory construction,” by “considering] the overall statutory scheme, legislative history, the history of evolving congressional regulation in the area, and other relevant statutes.” Philip Morris USA, Inc. v. Vilsack, 736 F.3d 284, 289 (4th Cir. 2013) (alteration and internal quotation marks omitted). At step one of Chevron “we focus purely on statutory construction without according any weight to the agency’s position.” Ojo, 813 F.3d at 539 (internal quotation marks omitted).
If we find that “Congress has not so spoken, in that the statute is silent or ambiguous, we defer to the agency’s interpretation if it is reasonable.” Id. at 539 (internal quotation marks omitted). “We therefore will not usurp an agency’s interpretive authority by supplanting its construction with our own, so long as the interpretation is not arbitrary, capricious, or manifestly contrary to the statute.” Philip Morris USA, 736 F.3d at 290 (internal quotation marks omitted).
3.
•The question whether an individual subject to a reinstated removal order is ineligible to seek asylum is one of first impression in our circuit. Six of our sister circuits have considered the question and all agree that such an individual is ineligible to apply for asylum. See Garcia Garcia v. Sessions, 856 F.3d 27, 31 (1st Cir. 2017); Cazun v. Att’y Gen. U.S., 856 F.3d 249, 251 (3d Cir. 2017); Jimenez-Morales v. U.S. Att’y Gen., 821 F.3d 1307, 1310 (11th Cir. 2016); Perez-Guzman, 835 F.3d at 1070; Ramirez-Mejia v. Lynch, 794 F.3d 485, 491 (5th Cir. 2015), pet’n for reh’g en banc denied, 813 F.3d 24(3 (5th Cir. 2016); Herrera-Molina v. Holder, 597 F.3d 128, 139 (2d Cir. 2010).
Three of these circuits have held that the reinstatement bar clearly precludes an individual subject to a reinstated removal order from seeking asylum relief. See Jimenez-Morales, 821 F.3d at 1310 (examining § 1231(a)(5) and § 1158 and concluding that “[a]s> asylum is a form of relief from removal” contained in Chapter 12 of Title 8 of the U.S. Code, an individual subject to a reinstated removal order “is not eligible for and cannot seek asylum”); Ramirez-Mejia, 794 F.3d at 490. (considering § 1158’s “discretionary nature” and concluding that “[a]ffording asylum relief to aliens whose removal orders are reinstated would be inconsistent with [§ 1231(a)(5)]”); Herrera-Molina, 597 F.3d at 139 (examining the plain language of § 1231(a)(5) and DHS regulations and holding that “relief other than .withholding of removal ... is not available to this petitioner”).
The remaining circuits have forged a different path. After attempting to harmonize § 1158 and § 1231(a)(5) by looking to the plain language of the provisions, employing canons of statutory construction, and reviewing the legislative history of IIRIRA, the Third and Ninth Circuits *584 concluded that Congress had not spoken directly to the instant issue. See Cazun, 856 F.3d at 255-59; Perez-Guzman, 835 F.3d at 1074-77. The First Circuit, by contrast, assumed without deciding that an ambiguity exists in the. interplay of § 1158(a)(1) and § 1231(a)(5). Garcia Garcia, 856 F.3d at 38. These courts thus moved on to Chevron’s second step, and once there, found the agency’s interpretation of § 1231(a)(5) to bar asylum relief to those subject to reinstated removal orders—a construction embodied in 8 C.F.R. § 1208.31(e)—to be reasonable and therefore entitled to deference. See Garcia Garcia, 856 F.3d at 38-41; Cazun, 856 F.3d at 259-61; Perez-Guzman, 835 F.3d at 1079-82.
There is much to commend in the view of the First, Third, and Ninth Circuits that the agency’s interpretation of § 1231(a)(5) to preclude asylum relief is a reasonable one and thereby entitled to deference. But as we explain below, we discern no ambiguity in the interplay between § 1231(a)(5) and § 1158(a)(1). We think it clear that, by enacting the reinstatement bar, Congress intended to preclude individuals subject to reinstated removal orders from applying for asylum. Accordingly, we hold that Calla Mejia is ineligible to apply for asylum.
a.
In considering these statutes, our goal is to “fit, if possible, all parts into an harmonious whole.” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Because “the plain language of the statute is the most reliable indicator of Congressional intent,” we look there first. Ojo, 813 F.3d at 539 (alteration and internal quotation marks omitted).
The plain text of § 1158 and § 1231(a)(5) reveals a tension between these provisions. Section 1158(a)(1) proclaims that “[a]ny alien ... irrespective of such alien’s status, may apply for asylum.” And, § 1231(a)(5) commands that an alien subject to a reinstated order of removal “may not apply for any relief under [Chapter 12 of Title 8].” At first glance, then, the broad grant of eligibility for asylum in § 1158(a)(1) seems just as absolute as the broad prohibition on relief for aliens subject to reinstated removal orders in § 1235(a)(5). And yet, neither provision is absolute.
To begin with, § 1158 is restricted by its own terms. Specifically, § 1158(a)(l)’s guarantee that “[a]ny alien” may apply for asylum is limited by § 1158(a)(2)’s clarification that there are some types of aliens who may not apply for asylum. In the same way, § 1231(a)(5)’s prohibition on applying for relief is subject to an important caveat, in that § 1231(b)(3)(A) restricts the Attorney General from removing an alien who qualifies for withholding of removal. Thus, notwithstanding the reinstatement bar’s broad language, “that section does not bar all types of relief.” Cazun, 856 F.3d at 264 (Hardiman, J., concurring in judgment). In other words, the text of both provisions—though at first blush absolute—allows for “interpretive flexibility.” Pet’r’s Br. at 26.
We therefore reject Calla Mejia’s contention that the asylum statute is unambiguous in its broad application to “[a]ny alien ... irrespective of such alien’s status,” 8 U.S.C. § 1158(a)(1) (emphasis added). Calla Mejia argues that the only exceptions to this categorical rule of eligibility appear within the closed universe of § 1158 itself, none of which apply to Calla Mejia, and that Congress therefore intended all aliens, even those subject to reinstated removal orders, to be eligible to seek asylum.
Calla Mejia’s textual arguments—lodged as they are in a statutory vacuum—do little to assist us with our interpretative *585 task. In support of her view that Congress spoke directly to this issue in the text of the asylum statute, Calla Mejia argues that Congress broadened the class of aliens who could seek asylum when, by enacting IIRIRA, it amended the relevant modifier contained in § 1158(a)(l)’s grant of eligibility from “an alien” to “any alien.” But Calla Mejia’s claim that Congress’s intent is made clear because it selected for § 1158(a)(1) a word with a particularly “expansive meaning,” United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997), applies equally to § 1231(a)(5)’s bar on “any relief,” selected by Congress on the same day.
Similarly unavailing is Calla Mejia’s’ argument that § 1231(a)(5) is inapplicable to forms of relief that do not explicitly reference the reinstatement bar. In her view, if Congress truly intended to exempt individuals subject to reinstated removal orders from § 1158(a)(l)’s broad reach, it would have done so by including within § 1158 an explicit cross-reference to § 1231(a)(5). But, as the government points out, if the reinstatement bar applied only to those types of relief amended to cross-reference § 1231(a)(6), then the reinstatement bar would be rendered superfluous “because Congress did not [so] specifically amend any of the relief provisions under Chapter 12 of Title 8.” Gov’t’s Br. at 31. Moreover, Calla Mejia’s favored construction would directly contravene the Supreme Court’s recognition that § 1231(a)(5) bars an alien subject to a reinstated removal order from applying for adjustment of status, notwithstanding the fact that the adjustment-of-status provision, 8 U.S.C. § 1255, contains no reference to the reinstatement bar. See Fernandez-Vargas, 548 U.S. at 35, 126 S.Ct. 2422.
But we also don’t agree with, the government that the-plain text of § 1231(a)(5) resolves this issue. According to the government, § 1231(a)(5) could not more plainly state that an alien subject to a reinstated removal' order “is not eligible and may not apply for any relief under” Chapter 12 of Title 8, wherein the asylum statute can be found. Thus, because asylum is clearly a “form of relief under this chapter” to which the reinstatement bar applies, the government says we’re bound to give effect to Congress’s unambiguous intent. But, as with Calla Mejia’s textual arguments, the government’s argument falls short because it too fails to square the reinstatement bar’s prohibition oh seeking “any relief’ with the broad grant of eligibility in the asylum provision.
Accordingly, we turn to canons of statutory construction to harmonize these provisions.[7] Chevron, 467 U.S. at 843 n.9, 104 S.Ct. 2778 (instructing courts to employ traditional tools of statutory construction to ascertain Congress’s clear .intent). “As a rule of statutory construction, ... the specific terms of a statutory scheme govern the general ones.” D.B. v. Cardall, 826 F.3d 721, 735 (4th Cir. 2016) (citing RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012)). This rule is “particularly applicable where ‘Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions,’ as it has done in the immigration context.” Id. (quoting RadLAX, 132 S.Ct. at 2071).
Though it is,-admittedly “[s]ome-times ... difficult .to determine whether a provision is a general or a specific one,” we conclude -that the reinstatement bar is more specific than .the asylum provision *586 and therefore controls our statutory inquiry. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 187 (2012). We apply the general-specific rule of construction “to statutes in which a general permission ... is contradicted by a specific prohibition.” D.B., 826 F.3d at 735 (internal quotation marks omitted). These provisions readily fall within these categories: § 1168(a)(1) contains a general permission—allowing “[a]ny alien” to apply for asylum—that is contradicted by § 1231(a)(5)’s specific prohibition—forbidding individuals subject to reinstated orders of removal from seeking relief. Thus, “in order to ‘eliminate the contradiction,’” we construe § 1231(a)(6) to serve as a specific exception to § 1158(a)(l)’s general grant of eligibility to apply for asylum. D.B., 826 F.3d at 736 (quoting RadLAX, 132 S.Ct. at 2071).
Calla Mejia’s argument that § 1158(a)(1) is the specific provision to which the gen: eral provision of § 1231(a)(5) must yield incorrectly frames the .inquiry. She urges that the reinstatement bar only generally forbids an individual subject to a reinstated removal order from applying for “any relief,” § 1231(a)(5), while the asylum statute deals with one specific form of relief from removal: asylum. But the question we must resolve is not what type of reliéf is available; instead, the antecedent question is who is entitled to - apply for that relief. The reinstatement bar “comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence.” Scalia & Garner, supra, at 183.
Stated differently, the asylum provision lays out general (and qualified) terms of eligibility for asylum. This’grant of permission presupposes that the recipient of the grant—the alien—is amenable to. regulation. The reinstatement bar, on the other hand, deals with one specific subset-of those recipients—aliens subject to reinstated removal orders—and attaches to this subset a categorical exemption from all forms of relief found in Chapter 12 of Title 8 of the U.S. Code, including' asylum. In our view, a law that attaches a categorical prohibition on a specific subset of aliens is most sensibly read to control when it conflicts with the law that grants permission.
Classifying the reinstatement bar as a specific exception to § 1158(a)(l)’s general grant of eligibility more effectively harmonizes the provisions than Calla Mejia’s proposed method. As an alternative to her invocation of the general-specific canon, Calla Mejia asks us to narrowly construe the undefined term of, “relief’ in § 1231(a)(5)' so as to “[encompass] ordinary...waivers of the deportation, rules,” such as voluntary departure, adjustment of status, and cancellation of removal, “but exclud[ej forms, of redress that amount to humanitarian . protection—asylum, withholding of removal, and [Convention Against Torture] protection.” Pet’r’s Br. at 27 (emphasis omitted). Putting aside the question of whether withholding of removal and protection under the Convention Against Torture are properly categorized as “protection” or “relief,” we think it beyond doubt that asylum is a form of “relief.” E.g., United States v. Denedo, 556 U.S. 904, 909, 129 S.Ct. 2213, 173 L.Ed.2d 1235 (2009) (defining the “familiar meaning” of “relief’ as “any ‘redress or benefit’ provided by a court” (quoting Black’s Law Dictionary 1317 (8th ed. 2004))).[8] Calla Mejia’s proposed construction would im-permissibly override- Congress’s intention to limit the types of relief available to *587 aliens' who illegally re-enter the United States after removal.
By enacting § 1231(a)(5), Congress sought to crack down on aliens who illegally re-enter the United States after removal by “enlarg[ing] the class of illegal reen-trants whose orders may be reinstated and limit[ing] the possible relief from a removal order available to them.” Fernandez-Vargas, 548 U.S. at 33, 126 S.Ct. 2422. That withholding of removal and protection under the Convention Against Torture remain available to Calla Mejia does not, as she suggests, require us to ignore Congress’s intent to bar her from applying for any relief, including asylum. Instead, we must give effect to both statutes, and construing § 1231(a)(5) to create a specific exception to § 1158(a)(l)’s general grant of eligibility to seek asylum’ accomplishes this goal.
To be sure, as Calla Mejia notes, Congress sought to ensure the availability of asylum to those aliens fleeing persecution. See, e.g., H.R. Rep. No. 104-469, pt. 1, at 13 (1996) (discussing ÍIRIRA’s revisions to procedures for removal and noting “[tjhroughout the process, the procedures protect those aliens who presént credible claims for asylum by giving them an opportunity for a full hearing on their claims”). But Congress also - sought to streamline the removal process for illegal re-entrants and to attach consequences to re-entry, including by restricting the forms of relief available to those who re-enter following removal. See, e.g., id. at 155 (“[T]he ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border.”). In light of this statutory purpose, we reject Calla Mejia’s view that Congress’s desire to make asylum available to aliens as a general matter overrides Congress’s intention to single out illegal re-entrants and bar them from seeking certain forms of relief.
In sum, we conclude that the interplay between § 1231(a)(5) and § 1158 is unambiguous: Congress intended that aliens subject to reinstated orders of removal be precluded from applying for asylum.[9]
b.
Calla Mejia’s remaining argument, premised on international law, is also unpersuasive. She says that barring illegal re-entrants from applying for asylum violates the Charming Betsy canon of interpretation—which requires courts to “construe ... statute[s]' consistent with our obligations under international law,” Kofa v. INS, 60 F.3d 1084, 1090 (4th Cir. 1995) (en banc) (citing Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804))—because it breaches our obligations under the 1967 United Nations Protocol Relating to the Status of Refugees.[10] Specifically, Calla Mejia points to Article 31(1) of the Protocol, which provides that signatories “shall *588 not impose penalties, on account of [an applicant’s] illegal entry or presence.” Protocol Relating to the Status of Refugees, art. 31(1), Jan. 31, 1967, 19 U.S.T. 6223. Calla Mejia claims that § 1231(a)(5)’s limitation on asylum constitutes such an impermissible “penalty” for those who illegally re-enter the United States after removal. The government counters that the United States’ obligations under the Protocol do not extend so. far as to “afford all aliens repeated opportunities to apply for asylum, each and every time they enter the United States illegally.” Gov’t’s Br. at 37-38.
We think the- government has the better of this argument. Calla Mejia offers no support for her contention that denying illegal re-entrants the ability to apply for asylum constitutes a “penalty,” a key term undefined by the Protocol. And the Supreme Court has emphasized that asylum is. a “discretionary mechanism” that corresponds to a “precatory” provision of the Protocol. Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207. We therefore perceive no basis for concluding that depriving aliens, upon illegal re-entry, additional opportunities to apply for discretionary relief constitutes a “penalty.”
Crucially, the opportunity to apply for withholding ■ of removal and Convention Against Torture protection remains available to aliens notwithstanding a reinstated removal order. It could be that “[i]f withholding of removal and [Convention Against Torture] protection were also eliminated for aliens who illegally reentered,” Calla Mejia’s argument would win the day. Ramirez-Mejia, 813 F.3d at 241. But, “Congress did not go so far,” and we therefore agree with our sister circuits that barring illegal re-entrants from applying for asylum doesn’t conflict with our international treaty obligations. Id.) see also Garcia Garcia, 856 F.3d at 41-42 (no conflict with Articles 28 or 34 of the U.N. Protocol); Cazun, 856 F.3d at 257 n.16 (no conflict with Articles 28, 31(1), or 34 of the U.N. Protocol).
B.
Calla Mejia alternatively seeks to apply for asylum on the ground that her reinstated order of removal is.invalid because it relies on a removal order that was entered in violation of her statutory and due process rights. To this end, Calla Mejia alleges that at the June 2015 hearing, the IJ: (1) failed to sufficiently inform her that she was eligible for asylum or that she could apply for asylum, and discouraged her from doing so; (2) failed to sufficiently advise her of the right to appeal; and (3) failed to inform her that she was eligible for pre-conclusion voluntary departure under 8 U.S.C. § 1229c(a)(l). Because we find- that Calla Mejia’s petition was not timely filed as to the underlying order of removal—which became final on June 10, 2015—we lack jurisdiction to address Calla Mejia’s objections to the June 2015 hearing.[11]
Ordinarily, under 8 U.S.C. § 1231(a)(5), after DHS makes the findings necessary for reinstatement, “the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed.” Calla Mejia seeks to avoid this broad limitation by relying on the jurisdic *589 tional provision of The REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. Codified at 8 U.S.C. § 1252(a)(2)(D), this provision states that notwithstanding “any other provision of this chapter (other than this section) which limits or eliminates judicial review,” courts of appeals retain jurisdiction to resolve “constitutional claims or questions of law raised upon a petition for review filed ... in accordance with this section.”
The jurisdictional limitation of § 1231(a)(5) clearly falls outside the scope of § 1252: It appears in a different section of Title 8, Chapter 12, and is therefore overridden by § 1252(a)(2)(D). Accordingly, we agree with Calla Mejia that § 1231(a)(5) doesn’t deprive us of jurisdiction to review the constitutional claims and questions of law that arise from ah underlying removal order in the reinstatement context. See, e.g., Villegas de la Paz v. Holder, 640 F.3d 650, 656 (6th Cir. 2010) (“[Section] 1252(a)(2)(D) re-vests the circuit courts with jurisdiction over constitutional claims or questions of law raised in the context of reinstatement proceedings.”); Lorenzo v. Mukasey, 508 F.3d 1278, 1281 (10th Cir. 2007) (“[W]e may no longer categorically hold that we lack jurisdiction to review constitutional and statutory claims related to all underlying removal orders.”).
However, our jurisdictional inquiry doesn’t end here. While the REAL ID Act gives us jurisdiction to review Calla Mejia’s constitutional and legal challenges to the underlying June 2015 removal order, her petition must still be “filed ... in accordance with [§ 1252].” 8 U.S.C. § 1252(a)(2)(D). As the government notes, § 1252(b)(1) requires that the petition “be filed not later than 30 days after the date of the final order of removal.” Calla Mejia doesn’t argue otherwise, but instead asserts that to give the “jurisdiction-restoring provision” of § 1252(a)(2)(D) any “real effect,” we must construe § 1252(b)(l)’s deadline to refer to the date on which the reinstated order of removal—not the original order—becomes final. Pet’r’s Opp’n -to Resp’t’s Mot. to Dismiss, at 16. Under Calla Mejia’s favored construction, because her reinstated order of removal became final 30 days before she filed the instant petition, we have jurisdiction.
In light of the plain text and purpose of § 1251(b)(1), we reject Calla Mejia’s reading and hold that the 30-day deadline runs from the date an original order of removal becomes final. And, as we’ve recognized, the 30-day time limit of § 1252(b)(1) constrains our review of an underlying order of removal, even where an alien raises constitutional or legal challenges. See Galicia-Vargas v. Holder, 586 Fed.Appx. 119, 120 (4th Cir. 2014) (citing § 1252(b)(1) and finding no jurisdiction to review alien’s challenges to underlying 1998 removal order because his “petition for review is not timely as to the underlying order of removal” (emphasis added)). We. reaffirm that holding today.
To accept Calla Mejia’s argument “would defeat the purpose of the statute’s time bar by allowing a challenge to an underlying removal order any time a reinstated order is issued.” Verde-Rodriguez v. Att’y Gen. U.S., 734 F.3d 198, 203 (3d Cir. 2013). Congress was clear when it enacted the REAL ID Act that the intended “overall effect of the proposed reforms” in the Act—including the jurisdictional provision of § 1251(a)(2)(D)—was “to give every alien a fair opportunity to obtain judicial review while restoring order and common sense to the judicial review process.” H.R. Rep. 109-72, at 174 (2005) (Conf. Rep.), as reprinted in 2005 U.S.C.C.A.N. 240, 299. Central to this goal of “order and common sense” was Congress’s desire that aliens “not be able to ignore the thirty-day time ■limit on seeking review.” Id.
*590 Calla Mejia warns that our interpretation of § • 1252(b)(1) contravenes the REAL ID Act and effectively “abolish[es] review of all underlying orders in reinstatement,” thereby raising “‘serious constitutional problems’ ”—namely, Suspension Clause concerns.[12] Pet’r’s Opp’n to Resp’t’s Mot. to Dismiss, at 12, 17 (quoting INS v. St. Cyr, 533 U.S. 289, 300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)). Not so. Rather, we think it more than feasible that an individual removed to her home country could illegally re-enter the United States, have the original removal order reinstated by DHS, and petition for review—all within a month’s time.
Moreover, given that an alien may move to reopen her removal proceedings pursuant to 8 U.S.C. § 1229a(c)(7), we find Calla Mejia’s concerns unavailing. See Luna v. Holder, 637 F.3d 85, 87 (2d Cir. 2011) (describing § 1229a(c)(7)’s motion to reopen process as “an adequate and effective substitute for habeas review” that resolves Suspension Clause concerns raised by § 1252(b)(l)’s 30-day deadline). In this case, Calla Mejia could have moved to reopen her removal proceedings, providing via affidavit or other evidence the material facts to be considered. ■ See 8 ■ C.F.R. § 1003.2(c). And Calla Mejia could have sought such relief even after she was removed to Peru, William v. Gonzales, 499 F.3d 329, 333 (4th Cir. 2007), and had ninety days after the removal order became final to do so, 8 U.S.C. § 1229a(c)(7)(C)(i). Moreover, even if Calla Mejia failed to file the motion within the statutory time limit, she could still seek -to equitably toll the deadline. Kuusk v. Holder, 732 F.3d 302, 305 (4th Cir. 2013). Given the avenues available to an alien subject to a reinstated removal order to seek judicial review of the underlying removal order, we- cannot agree with Calla Mejia that the government’s proposed construction of § 1252(b)(1)—which we now adopt—renders .the REAL ID Act “toothless:”
Thus, because Calla Mejia did not timely file her challenge to the June 2015 order of removal, we lack jurisdiction to review her claims.

PETITION FOR REVIEW DISMISSED IN PART' AND DENIED IN PART,

. The parties dispute whether and when Calla Mejia expressed fear of returning to Peru. No stretch of logic is required to conclude that Calla Mejia did at some point express fear, as she was undisputedly referred to an asylum *577 officer. Cf. 8 U.S.C. § 1225(b)(l)(A)(ii)' (providing that an immigration officer “shall refer [an] alien for an interview by an asylum officer" if the alien expresses “an intention to apply for asylum" or indicates “a fear of persecution").

. A Master Calendar Hearing is typically an alien’s first appearance before an IJ in removal proceedings. As a general matter, the purpose of the hearing is to explain to the alien the charges of removability, advise the alien of her rights in the proceedings, ask the alien whether she admits or denies the factual allegations and her removability under the charges, and schedule additional hearings. See 8C.F.R. § 1240.10.

. Calla Mejia's counsel requested that DHS re-charge Calla Mejia and seek her removal in a full proceeding, rather than by reinstatement, so that she could apply for asylum. DHS declined'to exercise prosecutorial discretion.

. This regulation was originally promulgated as 8 C.F.R. § 208.31(e), but was recodified in 2008 at 8 C.F.R. § 1208.31(e) to reflect the transfer of functions of INS to DHS, See Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9834 (Feb, 28, 2003). Where applicable, we refer to the recodified regulations,

. Considering the- same statutory asylum-eligibility issue raised by Calla Mejia, the Ninth Circuit in Perez-Guzman v. Lynch rejected the government’s assertion that, because the petitioner failed to put the BIA on notice of this statutory argument, he had not exhausted his administrative remedies. 835 F.3d 1066, 1073 (9th Cir. 2016). In the court’s view,- because "the BIA had no authority to disregard [8 C.F.R. § 1208.31(e)],” the petitioner did not need to exhaust his argument for asylum eligibility. Perez-Guzman, 835 F.3d at 1073. So toó here.

. Even accepting the dissent’s view that Selge-ka doesn’t mqan what .it says and that its futility rule applies to "forfeited” rather than "waived” claims, we cannot agree that Calla Mejia ”relinquish[ed] or abandoned] .'.. a known right.” See Dissent Op., at 596 (quoting United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Calla Mejia was limited to "full consideration of the request for withholding of removal only” before the IJ and appeal to the BIA therefrom, 8 C.F.R. § 1208.31(e). She could not have abandoned a right she did not have.

. The government proposes that the "later-enacted” § 1231(a)(5) should prevail over § 1158. But this tie-breaker is unavailable to us because both provisions were codified simultaneously in IIRIRA.

. We note also that asylum differs from withholding of removal and protection under- the Convention Against Torture in important ways. Specifically, entitlement to asylum requires less proof, is discretionary, and grants broader benefits to an alien.

. As a result, contrary to Calla Mejia’s assertion, the rule of lenity—which in the immigration context "stands for the proposition that ambiguities in deportation státutes should be construed in favor of the noncitizen,” Espinal-Andrades v. Holder, 777 F.3d 163, 170 (4th Cir. 2015)—has no role to play. See Hernandez v. Holder, 783 F.3d 189, 196 (4th Cir. 2015) ("[Bjecause the rule of lenity is a last resort, not a primary tool of construction ... it applies only where there is a grievous ambiguity or uncertainty in the statute.”) (internal citations, quotation marks, and alterations omitted). •

. The United States acceded to the Protocol, which incorporated the United Nations Convention Relating to the Status of Refugees, in 1968. INS v. Stevic, 467 U.S. 407, 416, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). "The Protocol bound parties to comply with the substantive provisions of Articles 2 through 34” of the Convention. Id.

. In so holding, we do not evaluate the manner in which the IJ conducted the June 2015 “rights presentation” to the asylum applicants, We note, however, that a discussion of an asylum applicant’s credibility is incom- ' píete without reference to the uniform view among the circuit courts of appeals, including ours, that initial "border” interviews "should be carefully scrutinized for reliability before being utilized by the fact-finder to evaluate an applicant’s credibility.” Qing Hua Lin v. Holder, 736 F.3d 343, 355 (4th Cir. 2013) (Thacker, J., concurring) (collecting cases).

. See U.S. Const, art. I, § 9, cl. 2. ("The Privilege of the Writ of Habeas Corpus 'shall not be suspended, unless when-in Cases of Rebellion or Invasion the public Safety may require it.’’).