**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1836

FRANCISCO LARA-AGUILAR,

Petitioner,

v.

JEFFERSON B. SESSIONS III, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 7, 2017                                  Decided: May 2, 2018

Before TRAXLER, KING, and HARRIS, Circuit Judges.

Petition for review denied by published opinion. Judge Traxler wrote the opinion in which Judge King and Judge Harris joined.

**ARGUED:** Shon Robert Hopwood, GEORGETOWN LAW APPELLATE COURTS IMMERSION CLINIC, Washington, D.C., for Petitioner. Matthew B. George, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Steven H. Goldblatt, Director, Sarah E. Balkissoon, Student Counsel, Hillary B. Neger, Student Counsel, Harry R.S. Phillips, Student Counsel, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Petitioner. Chad A. Readler, Acting Assistant Attorney General, Civil Division, Benjamin C. Mizer, Principal Deputy, Assistant Attorney General, Civil Division, Douglas E. Ginsburg, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

TRAXLER, Circuit Judge:

In the fall of 2013, Francisco Lara-Aguilar was caught while attempting to enter the United States illegally and subsequently removed. A few months later, Lara-Aguilar returned and attempted another unlawful border crossing but was caught in the act once again. As a result, the Department of Homeland Security ("DHS") opted to reinstate his prior order of removal under 8 U.S.C. § 1231(a)(5). This time, Lara-Aguilar sought various forms of relief from removal, including asylum and withholding of removal. Although Lara-Aguilar was granted withholding of removal, the Board of Immigration Appeals ("BIA") concluded that he was ineligible for asylum under § 1231(a)(5) based on his reinstated order of removal.

This court recently held that an alien subject to a reinstated order of removal may not apply for asylum. *See Mejia v. Sessions*, 866 F.3d 573, 584 (4th Cir. 2017). Lara-Aguilar, however, argues that because the factual basis for his asylum claim did not exist prior to his removal in 2013, *Mejia* does not cover his situation and he should be permitted to seek asylum based on the "changed circumstances" provision of 8 U.S.C. § 1158(a)(2)(D).

As explained below, we cannot subscribe to Lara-Aguilar's position, which is inconsistent with both the statute and *Mejia*. Accordingly, we deny the petition for review.

## I.

Lara-Aguilar is a native and citizen of El Salvador. In September 2013, he unlawfully entered the United States without inspection near Laredo, Texas. Lara-

2

Aguilar was apprehended and placed in expedited removal proceedings; he did not express a fear of returning to El Salvador at that time and he did not apply for asylum. In November 2013, Lara-Aguilar was removed to El Salvador pursuant to an Order of Expedited Removal. In February 2014, approximately three months after having been removed, Lara-Aguilar returned and once again unlawfully crossed into the United States without inspection. He was apprehended by border patrol agents near Hidalgo, Texas, and placed in detention. On February 12, 2014, DHS notified Lara-Aguilar it intended to reinstate his prior order of removal pursuant to 8 U.S.C. § 1231(a)(5).

This time, however, Lara-Aguilar indicated that he feared political persecution were he to return to El Salvador. A DHS asylum officer therefore conducted a reasonable fear interview, during which Lara-Aguilar stated that because he supported and worked on behalf of the ARENA political party during El Salvador's presidential election campaign in January 2014, supporters of the ruling FMLN party physically assaulted him on two occasions. On January 19, 2014, Lara-Aguilar was campaigning "house to house" for the ARENA party when he was accosted by FMLN supporters who told him to leave, punched him in "the stomach and the face," struck him in the back "with a long knife," and threatened to "chop [his] hands off." J.A. 395-96. Lara-Aguilar tried to report the incident to the police, but the police responded dismissively. Nonetheless, according to Lara-Aguilar, he continued his house-to-house campaigning activity until he had a second run-in with FMLN supporters. On January 23, 2014, FMLN campaigners stopped Lara-Aguilar and his colleagues—at gunpoint, this time—and tied their hands using the victims' own shoelaces. The FMLN supporters warned Lara-Aguilar and his friends not

3

to return, beat them, and discharged a round of ammunition near the group. Lara-Aguilar did not report this incident to local police "[b]ecause they had not listened to us the first time" and he "realized [reporting] it would be a waste of time." J.A. 398. Finally, Lara-Aguilar told the interviewing asylum officer that he could not safely live anywhere in El Salvador because "the FMLN is everywhere," J.A. 401, and that he therefore fled El Salvador for the United States, crossing the border without inspection on February 9, 2014. His wife and sons remain in El Salvador.

The asylum officer conducting the reasonable fear interview found Lara-Aguilar to be credible and concluded that he had "established that he was persecuted on account of his political opinion," J.A. 386, and that the government of El Salvador is "unable or unwilling to control FMLN party [members'] activities," J.A. 387. And, based on Lara-Aguilar's credible testimony regarding his past persecution, the asylum officer determined that Lara-Aguilar had established "a reasonable fear of persecution in the future" because of his association with the ARENA party. J.A. 387.

Following the reasonable fear interview, Lara-Aguilar's claim was referred to an immigration judge ("IJ") for withholding of removal proceedings. *See* 8 C.F.R. § 208.31(e) ("If an asylum officer determines that an alien described in this section has a reasonable fear of persecution or torture, the officer shall so inform the alien and issue a Form I–863, Notice of Referral to the Immigration Judge, for full consideration of the request *for withholding of removal only*." (emphasis added)). Even though the immigration regulations provided for withholding-only proceedings, *see* 8 C.F.R. §§ 208.31(e), 208.16, Lara-Aguilar sought asylum, withholding of removal, and protection

4

under the Convention Against Torture ("CAT").  The IJ concluded that § 1231(a)(5) precluded Lara-Aguilar from seeking asylum.  The IJ did not provide an in-depth analysis of this issue, stating only that, "based on the regulatory framework," he did "not have the authority to consider an application for asylum."  J.A. 127.[1]  The IJ did, however, grant Lara-Aguilar withholding of removal under 8 U.S.C. § 1231(b)(3)(A), ordering that he "be removed to any country other than El Salvador."  J.A. 130.

Lara-Aguilar appealed the IJ's conclusion that he lacked the authority to consider the asylum claim to the BIA.  Lara-Aguilar argued that "any bar that may exist due to the reinstatement of a prior order of removal does not apply where, as here, the asylum claim is *based on events arising after the prior order of removal was effected.*"  J.A. 3 (emphasis added).  Rejecting this argument, the BIA concluded that the relevant statutory provision, 8 U.S.C. § 1231(a)(5), "unambiguously states that an alien whose former removal order has been reinstated is not eligible, and therefore may not apply, for any relief from removal under the Act."  J.A. 4.  This provision, the BIA explained, "is intended to have an expansive meaning" and therefore cannot be read to foreclose only "asylum claims that arose prior to an alien's removal," as "[n]either the statute nor the regulations address such an exception."  *Id.*  Accordingly, the BIA affirmed the IJ's decision that Lara-Aguilar is ineligible for asylum.

---

[1] Prior to the merits hearing on Lara-Aguilar's claim for withholding of removal, the IJ explained on the record that, although "[Lara-Aguilar] can certainly raise the [asylum] issue, . . . I can't adjudicate it and I don't think the [BIA] will either.  The regulations say that with a reinstated order he can only apply for withholding of removal."  J.A. 145.

II.

Lara-Aguilar petitioned this court for review of the BIA's asylum decision. While Lara-Aguilar's petition for review was pending, this court decided *Mejia v. Sessions*, which addressed the issue of whether 8 U.S.C. § 1231(a)(5) precludes individuals subject to reinstated removal orders from applying for asylum. *See* 866 F.3d at 583-88. We directed the parties to submit supplemental briefs regarding *Mejia*'s effect, if any, on Lara-Aguilar's appeal.

*Mejia*'s fact pattern is substantially similar to the one presently before us with one notable exception: there, the alien had grounds to apply for asylum prior to her initial removal. In April 2015, Sonia Calla Mejia, a native of Peru, illegally entered the United States, crossing into Texas without presenting herself for inspection. She was apprehended by border patrol agents, and stated that she had come to the United States to "reside and work." *Id.* at 576 (internal quotation marks omitted). When she initially "denied that she would be harmed or face persecution if she returned to Peru," *id.* at 590 (Traxler, J., concurring in part and dissenting in part) (internal quotation marks omitted), agents placed her in expedited removal proceedings, *see* 8 U.S.C. § 1225(b)(1). Calla Mejia subsequently contradicted herself and stated she did, in fact, fear returning to Peru; accordingly, she was referred to an asylum officer for a reasonable fear interview. Calla Mejia told the asylum officer that she had been physically abused by her husband for years and that, because her husband was a police officer, law enforcement never afforded her any assistance or protection. The asylum officer determined that Calla Mejia had demonstrated a credible fear of persecution in Peru on account of her membership in a

6

particular social group and placed her in full removal proceedings before an immigration judge. *See Mejia*, 866 F.3d at 577.

At a master calendar hearing, the IJ advised Calla Mejia of her "right to apply for asylum, withholding of removal, and protection under the Convention Against Torture." *Id.* at 577. However, the IJ also explained to Calla Mejia that because she initially told agents she was here simply to work, she had a significant credibility issue: "[I]f you want to apply for asylum, withholding of removal and Convention Against Torture relief, I will allow it, but I should tell you, you have a credibility problem. A serious one." *Id.* (internal quotation marks omitted). Calla Mejia did not apply for relief. The IJ issued an order of removal, and Calla Mejia was removed to Peru in June 2015.

Approximately two months later, Calla Mejia was again apprehended by border patrol agents as she attempted to enter the United States unlawfully. DHS reinstated Calla Mejia's June 2015 order of removal pursuant to § 1231(a)(5). Calla Mejia again expressed a fear of returning to Peru and was referred for another reasonable fear interview. Once again, the asylum officer conducting the interview concluded that Calla Mejia "established that there is a reasonable possibility of suffering harm constituting persecution in the country to which [she] has been ordered removed . . . on account of . . . membership in a particular social group." *Id.* at 592 (internal quotation marks omitted; alteration and ellipses in original). However, "because Calla Mejia remained subject to a reinstated order of removal, DHS placed her in 'withholding-only' proceedings." *Id.* at 578; *see* 8 C.F.R. § 208.31(e). In addition to seeking withholding of removal, Calla Mejia filed an application for asylum, arguing that "despite her placement in

7

withholding-only proceedings, she was statutorily eligible to apply for asylum." *Mejia,* 866 F.3d at 578. The IJ disagreed, concluding that the reinstated removal order rendered Calla Mejia ineligible for asylum. *See id.*

Calla Mejia petitioned this court for review, contending that the asylum provision gave her the right to apply for asylum because it provides that "*[a]ny alien* who is physically present in the United States . . . , *irrespective of such alien's status*, may apply for asylum in accordance with this section." 8 U.S.C. § 1158(a)(1) (emphasis added); *see Mejia,* 866 F.3d at 584. The government took the position that the reinstatement bar set forth in § 1231(a)(5) "categorically prohibits individuals with reinstated orders of removal from applying for asylum relief." *Mejia,* 866 F.3d at 576.

This court "discern[ed] no ambiguity in the interplay between § 1231(a)(5) and § 1158(a)(1)" and determined that, "by enacting the reinstatement bar, Congress intended to preclude individuals subject to reinstated removal orders from applying for asylum." *Id.* at 584. Several points from *Mejia*'s analysis bear mentioning. First, *Mejia* noted that neither § 1158(a)(1) nor § 1231(a)(5) are absolute. *Mejia* explained that § 1158(a)(1) is restricted by its own terms—its broad provision that "[a]ny alien" may apply for asylum "irrespective of such alien's status" is limited by specific exceptions listed in § 1158(a)(2)—an alien who can be removed to a "[s]afe third country" may not apply for asylum, *see* 8 U.S.C. § 1158(a)(2)(A), nor may an alien apply for asylum if he fails to do so "within 1 year after the date of the alien's arrival," 8 U.S.C. § 1158(a)(2)(B), or if he has previously had an asylum application denied, *see* 8 U.S.C. § 1158(a)(2)(C). *See Mejia,* 866 F.3d at 584. Likewise, *Mejia* explained that "§ 1231(a)(5)'s prohibition on

8

applying for relief is subject to an important caveat, in that § 1231(b)(3)(A) restricts the Attorney General from removing an alien who qualifies for withholding of removal." *Id.*

Second, *Mejia* rejected the argument that the only exceptions to § 1158(a)(1)'s rule of asylum eligibility were spelled out by Congress in § 1158(a)(2), *see id.*, and that this reflected Congress's intent that "all aliens, even those subject to reinstated removal orders, . . . be eligible to seek asylum." *Id.* *Mejia* also found "unavailing" the position that the reinstatement bar to relief imposed by "§ 1231(a)(5) is inapplicable to forms of relief that do not explicitly reference the reinstatement bar," that is, "if Congress truly intended to exempt individuals subject to reinstated removal orders from § 1158(a)(1)'s broad reach, it would have done so by including within § 1158 an explicit cross-reference to § 1231(a)(5)." *Id.* at 585. In doing so, we explained that "if the reinstatement bar applied only to those types of relief amended to cross-reference § 1231(a)(5), then the reinstatement bar would be rendered superfluous because Congress did not so specifically amend any of the relief provisions under Chapter 12 of Title 8." *Id.* (internal quotation marks and alteration omitted).[2]

Ultimately, in order "to square the reinstatement bar's prohibition on seeking 'any relief' with the broad grant of eligibility in the asylum provision," the court resorted to

---

[2] The court observed that such a reading of the statute "would directly contravene" the Supreme Court's conclusion in *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 35 (2006), "that § 1231(a)(5) bars an alien subject to a reinstated removal order from applying for adjustment of status, notwithstanding the fact that the adjustment-of-status provision, 8 U.S.C. § 1255, contains no reference to the reinstatement bar." *Mejia v. Sessions*, 866 F.3d 573, 585 (4th Cir. 2017).

the canons of statutory construction and applied the rule that "'the specific terms of a statutory scheme govern the general ones.'" *Id.* (quoting *D.B. v. Cardall*, 826 F.3d 721, 735 (4th Cir. 2016)). In so doing, the court determined that "the reinstatement bar is more specific than the asylum provision and therefore controls our statutory inquiry." *Id.* at 585-86. As *Mejia* explained:

> We apply the general-specific rule of construction to statutes in which a general permission is contradicted by a specific prohibition. These provisions readily fall within these categories: § 1158(a)(1) contains a general permission—allowing any alien to apply for asylum—that is contradicted by § 1231(a)(5)'s specific prohibition—forbidding individuals subject to reinstated orders of removal from seeking relief. Thus, in order to eliminate the contradiction, we construe § 1231(a)(5) to serve as a specific exception to § 1158(a)(1)'s general grant of eligibility to apply for asylum.

*Id.* at 586 (internal alterations, citations and quotation marks omitted).

In concluding its analysis, *Mejia* observed that "[c]lassifying the reinstatement bar as a specific exception to § 1158(a)(1)'s general grant of [asylum] eligibility" would give effect to both provisions without trenching on congressional purpose and intent. *Id.* The court explained that "[b]y enacting § 1231(a)(5), Congress sought to crack down on aliens who illegally re-enter the United States after removal by 'enlarg[ing] the class of illegal reentrants whose orders may be reinstated and limit[ing] the possible relief from a removal order available to them.'" *Id.* at 587 (quoting *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 33 (2006)). Congress accomplished this purpose by attaching a "categorical prohibition" on asylum to "aliens subject to reinstated removal orders." *Id.* at 586. Had it interpreted § 1158(a)(1) to control § 1231(a)(5), the court continued, it would have

overriden "Congress's intention to single out illegal re-entrants and bar them from seeking certain forms of relief." *Id.* at 587 (alterations omitted).

## III.

Although Lara-Aguilar concedes that "*Mejia* decides the issue the issue of whether reinstatement generally bars him from applying for asylum," Supp. Opening Brief of Petitioner at 1, he contends that *Mejia* does not foreclose his argument because it did not specifically address the interplay between § 1158(a)(2)(D) and § 1231(a)(5). Lara-Aguilar contends that Congress did not intend for the reinstatement bar to prohibit aliens who are subject to reinstated orders of removal from applying for asylum based on circumstances that arose *after* the alien's initial removal. Lara-Aguilar grounds his argument in § 1158(a)(2)(D), which he reads to permit aliens to apply for asylum, notwithstanding any other statutory provision, based on materially changed circumstances. To resolve what he believes is a direct conflict between § 1158(a)(2)(D) and § 1231(a)(5), Lara-Aguilar would apply the general-specific canon of statutory interpretation, as did the court in *Mejia*. Lara-Aguilar reaches the conclusion that § 1158(a)(2)(D)'s changed circumstances provision is more specific than § 1231(a)(5)'s reinstatement bar and therefore controls. He further argues that the Attorney General's contrary interpretation that § 1158(a)(2)(D) does not override § 1231(a)(5)'s reinstatement bar effectively reads the changed circumstances provision out of the statute and leads to absurd results. We disagree. As explained below, Lara-Aguilar's arguments are inconsistent with the plain terms of § 1158(a)(2)(D) and run contrary to *Mejia*'s holding that § 1231(a)(5) attaches a categorical prohibition against applying for asylum to

11

aliens subject to reinstated orders of removal. *See* 866 F.3d at 586-87. Thus, we are constrained to reject them.

A.

As we explained in *Mejia*, "the asylum provision lays out general (and qualified) terms of eligibility for asylum," while "[t]he reinstatement bar, on the other hand, deals with one specific subset of those recipients—aliens subject to reinstated removal orders—*and attaches to this subset a categorical exemption from all forms of relief found in Chapter 12 of Title 8 of the U.S. Code, including asylum.*" *Id.* (emphasis added). Applying the general-specific canon of statutory interpretation, we concluded that § 1231(a)(5)'s reinstatement bar, "a law that attaches a *categorical* prohibition on a specific subset of aliens," *id.* (emphasis added), controls any conflicts with § 1158(a)(1), which generally grants eligibility to seek asylum to the superset of "[a]ny" aliens "irrespective of . . . status," § 1158(a)(1); *see Mejia*, 866 F.3d at 585-86 ("[W]e conclude that the reinstatement bar is more specific than the asylum provision and therefore controls our statutory inquiry.").

*Mejia* stressed that in passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, Congress unequivocally intended to *categorically* prohibit aliens subject to reinstated orders of removal from seeking asylum. *See id.* at 586-87. We explained that this view of the interplay between § 1158(a)(1) and § 1231(a)(5) not only gave effect to both statutes, but was also consistent with Congress's purpose in enacting the reinstatement bar—"to crack down on aliens who illegally re-enter the United States after removal" and

12

"attach consequences to re-entry, . . . by restricting the forms of relief available to those who re-enter following removal." *Id.* Elaborating on this purpose, *Mejia* noted that "[b]efore IIRIRA, aliens who illegally re-entered the United States after removal were placed in the same removal proceedings as those aliens not subject to a previous removal order, affording them additional hearings before an IJ." *Id.* at 579. Congress, however, was "[f]rustrated with the duplicative nature of this existing process," and therefore "sought to 'toe[ ] a harder line' with 'illegal reentrants.'" *Id.* at 579-80 (quoting *Fernandez-Vargas*, 548 U.S. at 34–35). Congress sought "to single out illegal re-reentrants and bar them from seeking" asylum. *Id.* at 587.

Lara-Aguilar's argument, in effect, is that the prohibition imposed by § 1231(a)(5) is *not* categorical. *Mejia* forecloses this argument and we must reject it. *See United States v. Bullard*, 645 F.3d 237, 246 (4th Cir. 2011) ("[A] panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court." (internal quotation marks omitted)).

## B.

Even if *Mejia* did not foreclose Lara-Aguilar's claim as a general matter, his argument is ultimately defeated by the very terms of the statute. Lara-Aguilar suggests that to determine Congressional intent as to whether § 1158(a)(2)(D) or § 1231(a)(5) controls here, we should apply, as the court did in *Mejia*, the well-established rule of statutory interpretation that "'the specific terms of a statutory scheme govern the general ones.'" *Mejia*, 866 F.3d at 585 (quoting *Cardall*, 826 F.3d at 735); *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (explaining that where "a

13

general . . . prohibition is contradicted by a specific . . . permission," the specific permission controls). Lara-Aguilar argues that the changed circumstances provision set forth in § 1158(a)(2)(D) is more specific than the reinstatement bar and therefore controls. Lara-Aguilar urges us to conclude that § 1231(a)(5)'s bar to relief for aliens subject to reinstated removal orders is a general prohibition that is *contradicted by* the specific permission granted by the changed circumstances provision of § 1158(a)(2)(D). And, indeed, were that the case, the latter would control the former.

But such is not the case. Conflict between the two statutory provisions is key—without it, there is no need for the interpreting court to resort to the general-specific canon to determine Congressional intent:

> Where one section of an act deals with a subject in general terms and another deals with part of the same subject in a more detailed way, the two should be harmonized if possible. But *if two statutes or provisions conflict*, the general statute or provision must yield to the specific statute or provision involving the same subject.

2A N. Singer, Sutherland Statutes & Statutory Construction § 46:5 (7th ed. 2017) (emphasis added; footnote omitted). As this court has explained, "[i]t is a basic principle of statutory construction that *when two statutes are in conflict*, a specific statute closely applicable to the substance of the controversy at hand controls over a more generalized provision." *Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 302 (4th Cir. 2000) (emphasis added; internal quotation marks omitted), *aff'd, Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002). As this language suggests, the general-specific rule of construction "applies only when specific and general statutory provisions conflict." *Bloate v. United States*, 559 U.S. 196, 226 (2010) (Alito, J., dissenting). It is applied "[t]o eliminate the

14

contradiction" between general and specific statutory provisions. *RadLAX Gateway Hotel*, 566 U.S. at 645.

*Mejia* turned to the general-specific rule of construction only because resorting to the statutory text "fail[ed] to square the reinstatement bar's prohibition on seeking 'any relief' with the broad grant of eligibility in the asylum provision." 866 F.3d at 585. The court noted that "§ 1158(a)(1) contains a general permission . . . that is contradicted by § 1231(a)(5)'s specific prohibition" and that application of the general-specific rule was necessary to "eliminate the contradiction." *Id.* at 586 (internal quotation marks omitted). We have no such need here because resort to the plain text of the statute reveals that the asserted conflict between § 1158(a)(2)(D) and § 1231(a)(5) is merely illusory.

The asylum provision states than "[a]ny alien . . . , irrespective of such alien's status, may apply for asylum in accordance with this section." 8 U.S.C. § 1158(a)(1). An alien who may otherwise be able to apply for asylum under § 1158(a)(1) may nonetheless be ineligible to do so if he fits within one of the three exceptions listed in § 1158(a)(2). Each exception enumerates one "class" of aliens that is "ineligible to apply for asylum." *Mejia*, 866 F.3d at 579. The three classes of ineligible aliens are

● aliens who can be removed to a "[s]afe third country," 8 U.S.C. § 1158(a)(2)(A);

● aliens who fail to apply for asylum "within 1 year after the date of the alien's arrival," 8 U.S.C. § 1158(a)(2)(B); and

● aliens who have previously had an asylum application denied, *see* 8 U.S.C. § 1158(a)(2)(C).

15

As previously noted, *Mejia* rejected the idea that the only exceptions to the broad eligibility rule for asylum under § 1158(a)(1) are those three exceptions listed in § 1158(a)(2). *Mejia* construed the reinstatement bar "as a *specific exception* to § 1158(a)(1)'s general grant of eligibility to apply for asylum." 866 F.3d at 586 (emphasis added). Seizing on *Mejia*'s classification of § 1231(a)(5) as a "specific exception to § 1158(a)(1)," Lara-Aguilar's argument equates § 1231(a)(5) with the exceptions set forth in § 1158(a)(2)—he reads *Mejia* as treating § 1231(a)(5) as if it were a fourth exception enumerated by § 1158(a)(2). As such, Lara-Aguilar argues, § 1231(a)(5) must be subject to § 1158(a)(2)(D)'s changed circumstances provision, just like the other exceptions included in § 1158(a)(2). We cannot agree.

First, Lara-Aguilar ignores the language and structure of § 1158(a)(2). The changed circumstances provision does not apply to every statutory exception listed in § 1158(a)(2). Rather, by its express terms, § 1158(a)(2)(D) *applies only to two of the three exceptions enumerated in* § 1158(a)(2):

> An application for asylum of an alien may be considered, *notwithstanding subparagraphs (B) and (C)*, if the alien demonstrates to the satisfaction of the Attorney General either the existence of *changed circumstances which materially affect the applicant's eligibility* for asylum or *extraordinary circumstances relating to the delay* in filing an application within the period *specified in subparagraph (B)*.

8 U.S.C. § 1158(a)(2)(D) (emphasis added). The changed circumstances provision refers only to subparagraphs (a)(2)(B) and (C)—not to subparagraph (A). By the same token, subparagraphs (B) and (C) expressly note that § 1158(a)(2)(D) applies—subparagraph (A) does not. *See* 8 U.S.C. § 1158(a)(2)(B) ("*Subject to subparagraph (D)*, paragraph (1)

16

shall not apply to an alien unless the alien demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States." (emphasis added)); 8 U.S.C. § 1158(a)(2)(C) ("*Subject to subparagraph (D)*, paragraph (1) shall not apply to an alien if the alien has previously applied for asylum and had such application denied." (emphasis added)). The changed circumstances provision therefore does not apply to every exception listed by Congress in § 1158(a)(2), but only the ones explicitly cross-referenced. Even if under *Mejia* § 1231(a)(5)'s reinstatement bar should be slotted in under § 1158(a)(2) as a fourth exception to § 1158(a)(1)'s general grant of eligibility to apply for asylum, § 1231(a)(5) would not be subject to § 1158(a)(2)(D). Obviously, subparagraph (D) does not reference § 1231(a)(5), nor does § 1231(a)(5) indicate that it is subject to the changed circumstances provision in § 1158(a)(2)(D). Section 1158(a)(2)(D), by its own terms, simply does not apply. Accordingly, there is no irremediable conflict requiring us to invoke the general-specific rule of interpretation.

## IV.

Lara-Aguilar next argues that the Attorney General's interpretation, as a practical matter, reads § 1158(a)(2)(D) out of the statute. Courts have an interpretive "duty to give effect," whenever possible, "to a statute's "every clause and word." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted). Under the "rule against superfluities," "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal quotation marks omitted). Lara-Aguilar's argument

17

rests on the premise that the "likely consequence" of an unsuccessful or untimely asylum application is removal and then, should that alien return, a reinstated order of removal under § 1231(a)(5). Under the Attorney General's reading of the statute, the reinstated order of removal would then preclude the alien, even if he could demonstrate changed circumstances under § 1158(a)(2)(D), from applying for asylum. Thus, Lara-Aguilar reasons that because this is the likely chain of events, it would be a practical impossibility, under the Attorney General's interpretation, for aliens to ever seek asylum based on changed circumstances under § 1158(a)(2)(D).

For Lara-Aguilar's superfluity argument to hold water, every alien covered by § 1158(a)(2)(D) must necessarily be subject to a reinstated order of removal under § 1231(a)(5). But this is not the case. *See, e.g., Perez-Guzman v. Lynch*, 835 F.3d 1066, 1082 (9th Cir. 2016) (rejecting the "incorrect" assumption "that any individual to whom § 1158(a)(2)(D) applies will *necessarily* be subject to a reinstated removal order"). "The reinstatement of a prior removal order is neither automatic nor obligatory, and the Attorney General has discretion not to reinstate an individual's earlier removal order and instead place him in ordinary removal proceedings," which would permit a "second asylum claim in light of his changed circumstances—something that would ordinarily be precluded by § 1158(a)(2)(C)." *Id.* (internal quotation marks omitted).

Lara-Aguilar's position also assumes that any alien in his position has no choice but to reenter the United States illegally after having been removed. Illegal reentry, however, is not the only option for an alien who wishes to avail himself of § 1158(a)(2)(D)'s changed circumstances provision. Rather, "aliens subject to removal

18

orders may continue to apply for asylum by *lawfully* approaching a port of entry without illegally crossing the border." *Cazun v. Att'y Gen. United States*, 856 F.3d 249, 261 n.20 (3d Cir. 2017).

V.

Finally, Lara-Aguilar argues that the Attorney General's interpretation of the statute will produce an absurd result that Congress could not have intended. An alien who is successfully removed from the United States—*i.e.*, an alien who, in a sense, "cooperates" with a removal order—is barred by § 1231(a)(5) from applying for asylum upon illegal reentry. But, an alien who evades a removal order and remains in the United States unlawfully may be able to apply for asylum under our reading of § 1158(a)(2)(D) based on changed circumstances because he was *never actually removed*. In other words, an alien can avoid the reinstatement bar by remaining unlawfully rather than returning illegally. Lara-Aguilar urges us to adopt his preferred reading of the statute to eliminate this anomalous result and ensure that both groups of aliens—those that remain unlawfully and those that reenter illegally—may seek asylum based on changed circumstances.

We are to avoid "interpretations of a statute which would produce absurd results . . . if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). However, a statutory interpretation that produces surprising or anomalous results is not the same as one producing *absurd* results. Indeed, to "truly be characterized as absurd," the interpretation of a statute must result in an outcome "that is so gross as to shock the general moral or common sense." *Sigmon Coal*, 226 F.3d at 304 (internal quotation marks omitted).

19

Thus, an interpretation of a statute that produces "plausible" results cannot violate the absurd-result rule of statutory construction. *Id.* at 308.

It is certainly plausible that Congress intended the differing treatment under § 1158(a)(2)(D) and § 1231(a)(5) of aliens who illegally reenter after having been removed previously and warned not to return, and aliens who remain in the United States unlawfully while subject to an (unexecuted) order of removal. Congress's interest in curtailing illegal reentry would "explain [this] disparate treatment." *Cazun*, 856 F.3d at 266 (Hardiman, J., concurring). As noted previously, "[b]y enacting § 1231(a)(5), Congress sought to crack down on aliens who illegally re-enter the United States after removal." *Mejia*, 866 F.3d at 587. Allowing serial border-jumpers to "cross into the United States over and over with no consequences [would undermine] the credibility of our efforts to secure the border." *Id.* (quoting H.R. Rep. No. 104-469, pt. 1, at 155). Thus, "Congress meant to strengthen the effect of the reinstatement bar." *Cazun*, 856 F.3d at 260. The interpretation that we adopt today is faithful to Congress's intent.

VI.

For the foregoing reasons, the petition for review is denied.

*PETITION FOR REVIEW DENIED*