**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-4149**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

MICHAEL JAMES YOUNG, JR., a/k/a Unc,

Defendant – Appellant.

**No. 19-4222**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

VANCE EDWARD VOLIOUS, JR., a/k/a Dank, a/k/a Black,

Defendant – Appellant.

Appeals from the United States District Court for the District of South Carolina, at Columbia.  J. Michelle Childs, District Judge.  (3:17-cr-00575-JMC-1; 3:17-cr-00575-JMC-2)

Argued:  November 2, 2020                    Decided:  February 26, 2021

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

_____

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Harris and Judge Thacker joined.

_____

**ARGUED:** Jonathan McKey Milling, MILLING LAW FIRM, LLC, Columbia, South Carolina; Aimee Zmroczek, A.J.Z. LAW FIRM, LLC, Columbia, South Carolina, for Appellants. Brook Bowers Andrews, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** Sandra V. Moser, MILLING LAW FIRM, LLC, Columbia, South Carolina, for Appellant Michael James Young, Jr. A. Lance Crick, Acting United States Attorney, Greenville, South Carolina, Kathleen Michelle Stoughton, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

_____

DIAZ, Circuit Judge:

Michael James Young, Jr. wanted his ex-wife dead. While serving a prison sentence for an unsuccessful first attempt on her life, Young concocted a plot for several friends on the outside, including Vance Edward Volious, Jr., to mail her a bomb and finish the job. There was but one (big) hitch; the bombmaker he contacted to design the bomb was an undercover FBI agent, and the bomb his friends tried to send was a dud by design. Young and Volious were indicted, a jury convicted them on several counts, and they appealed. Foremost among the questions we must now answer is whether an inert bomb is a nonmailable item under federal law.

## I.

## A.

While Young was in prison for attempting to kill his ex-wife (and killing his ex-father-in-law), he used a contraband cell phone to orchestrate a drug-dealing conspiracy. Young would contact a supplier, purchase the drugs, and arrange shipment to houses where Volious and Vincent Meredith (another friend on the outside) lived. Young would then arrange for another friend, frequently Tyrell Fears, to pick up the drugs and distribute them.

In February 2017, Young used the contraband cell phone to access the dark web and contact someone he believed to be a Russian bombmaker. After a few months of negotiations, Young purchased what he thought was a mail bomb and arranged for the bombmaker to send the device unarmed to Meredith's house and separately send a prepaid

3

shipping label to Volious's house. Young asked that the shipping label bear his ex-wife's address and asked that both packages contain instructions for arming the device.

What Young didn't know was that his dark web contact was an undercover FBI agent. The FBI built an inert device that ostensibly matched what Young asked for. It contained small amounts of explosives, but by design it couldn't explode. The FBI then sent the shipping label to Volious, per Young's request, and had an undercover postal inspector hand-deliver the inert device to Meredith's address.

After Volious received the label and delivered it to Fears, Fears went to Meredith's house, followed the instructions for arming the device, and placed the shipping label on the package. The FBI watched as Fears placed the device between two mail receptacles, where postal workers normally would have picked it up and placed it into the mail had the FBI not intercepted it first.

## B.

The government charged Young and Volious with the following four counts: (1) a criminal conspiracy with several objectives; (2) aiding and abetting the transportation of an explosive in interstate commerce to kill an individual; (3) aiding and abetting the mailing of a non-mailable item with intent to kill; and (4) aiding and abetting the carrying of an explosive during the commission of a felony. A jury convicted Young and Volious on each count, and the court sentenced each to lengthy prison terms.

This appeal followed.

II.

Young and Volious make five challenges to their convictions, each with its own standard of review. The pair makes its first two arguments together, but Volious brings the final three alone. We discuss each in turn.

A.

Young and Volious's primary argument is a two-part challenge to their convictions for aiding and abetting the mailing of a nonmailable item under 18 U.S.C. § 1716(j)(2). They first contend that the package Fears placed in the mail doesn't qualify as a nonmailable item under federal law.[1] Next, they argue that the record evidence is insufficient to support their convictions for mailing a nonmailable item.

1.

The first part of Young and Volious's argument raises a question of statutory interpretation that we consider de novo. *See Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 242–43 (4th Cir. 2009). The relevant statute provides that:

> Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, . . . *anything declared nonmailable by this section*, whether or not transmitted in accordance with the rules and regulations authorized to be prescribed by the Postal Service, with intent to kill or injure

---

[1] Young and Volious also argue in their reply brief that we should resolve this issue in their favor under the rule of lenity. But they likely waived that argument by failing to present it in their opening brief. *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 604 n.4 (4th Cir. 2010) (arguments not raised in opening brief are waived); *see also United States v. Everhart*, 436 F. App'x 269, 271 (4th Cir. 2011) (rule of lenity defense is waivable); *United States v. Husmann*, 765 F.3d 169, 180 n.7 (3d Cir. 2014) (Van Antwerpen, J., dissenting) (same). In any event (as we explain), we find no ambiguity in the statute warranting application of the rule.

another, or injure the mails or other property, shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1716(j)(2) (emphasis added). The statute also describes which items qualify as nonmailable:

> All kinds of poison, and all articles and compositions containing poison, and all poisonous animals, insects, reptiles, and *all explosives*, hazardous materials, inflammable materials, infernal machines, and mechanical, chemical, *or other devices or compositions which may ignite or explode*, and all disease germs or scabs, and all other natural or artificial articles, compositions, or material which may kill or injure another, or injure the mails or other property . . . .

18 U.S.C. § 1716(a) (emphases added).

The government elected at trial to prove only that the device was an "explosive," Appellee's Br. at 21, and chose not to prove that it was an "other device[] or composition[] which may ignite or explode." 18 U.S.C. § 1716(a). The evidence at trial showed that the inert bomb contained high explosives. Young and Volious nonetheless argue that the package didn't contain an "explosive" within the meaning of § 1716(a) because the FBI designed the bomb not to explode. Neither § 1716's language nor the sparse case law on the subject support their view.

a.

We begin with the text. *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) ("As in all statutory construction cases, we start with the plain text of the provision." (internal quotation marks omitted)). Since § 1716 doesn't define "explosive," we must give the word its "ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). Dictionaries define "explosive," when used as a noun, to

6

mean an "explosive substance," *Explosive*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/explosive (last visited Feb. 22, 2021), or "[a]n explosive substance, object, or device," *Explosive*, OXFORD ENGLISH DICTIONARY (3d ed. 2016), https://www.oed.com/view/Entry/66677?redirectedFrom=explosive#eid (last visited Feb. 22, 2021).

In this context, we must interpret the meaning of "all explosives" to exclude explosive "objects" or "devices" because § 1716(a) lists "other devices or compositions which may ignite or explode" as a category of nonmailable items separate from "all explosives." Reading "all explosives" to encompass "devices or compositions which may ignite or explode" would render the latter phrase superfluous, which we're loath to do. *See United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 304 (2019). Indeed, the "canon against surplusage" is at its "strongest" in cases like this one, where one party's interpretation "would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). In such cases, we favor "competing interpretation[s]" that give "effect to every clause and word of a statute." *Id.* at 385.

The government's interpretation does just that. The government explains that we should understand the term "all explosives" in this context to refer only to explosive substances, not finished devices. Not only does that reading avoid superfluity, but it's also consonant with Congress's use of other terms in the statute. *See United States v. Serafini*, 826 F.3d 146, 149 (4th Cir. 2016) (to discern a statute's ordinary meaning, courts look not

7

only "to the language itself, but also the specific context in which that language is used, and the broader context of the statute as a whole").

For example, § 1716(a) prohibits individuals from mailing "[a]ll kinds of poison" *and* "all articles containing poison." It also bans people from mailing "inflammable materials" *and* "devices or compositions which may ignite." 18 U.S.C. § 1716(a). In both cases, Congress used separate language to enact separate bans on mailing (1) a dangerous substance or material (poison or inflammable materials) *and* (2) objects incorporating that substance or material (all articles containing poison or devices or compositions which may ignite).

That pattern should hold true for explosives too. By banning "all explosives" as well as "other devices or compositions which may . . . explode," Congress intended to enact separate bans on mailing (1) explosive substances or materials and (2) devices or compositions incorporating those substances or materials.

Young and Volious assert that § 1716(a) doesn't apply to explosives mailed in such small quantities, or packaged in such a manner, that they couldn't possibly do any harm.[2] They argue that the placement of the word "explosives" next to "hazardous materials, inflammable materials, infernal machines, and mechanical, chemical, or other devices or compositions which may ignite or explode" suggests that Congress intended to prevent people from mailing only those objects that could actually cause harm by exploding or

---

[2] We express no opinion on whether, as a matter of fact, the explosives within the FBI's inert bomb could have caused harm.

8

igniting. Because an inert bomb presents no safety concerns, they assert, it can't be an "explosive" within the meaning of § 1716(a).

We disagree. Congress's use of the word "all" before "explosives" suggests that it intended to prohibit the mailing of any explosive substance regardless of how it's packaged or the quantities in which it's sent. Were it otherwise, the statute would allow anyone to send "mail-safe" explosives to a recipient who could use them to assemble a functional bomb and accomplish the sender's goal of harming another. That would be an absurd construction of a statute that exists, as Young and Volious concede, for the "protection of the public and those mail delivery personnel who might otherwise hold in their possession parcels which conceal items that might explode and cause harm." Appellants' Br. at 11. And courts, of course, should interpret statutes to avoid absurdities. *Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir.), *cert. denied sub nom. Lara-Aguilar v. Whitaker*, 139 S. Ct. 621 (2018).

Young and Volious's reading of the statute would force a similarly absurd result by requiring postal workers and people mailing packages to determine acceptable levels of explosive materials sent through the mail. Imposing such a duty would require a chemist's knowledge of explosive substances, which would be silly, not to mention dangerous. Indeed, slight miscalculations or unanticipated environmental factors during transit could potentially cause otherwise "safe" levels of explosives to become unsafe. *See United States v. Sheehan*, 838 F.3d 109, 117 (2d Cir. 2016) (discussing evidence that an otherwise dysfunctional explosive device could unintentionally detonate when exposed to "heat, shock, or friction").

9

Simply prohibiting the mailing of all explosives in whatever form is far more consistent with the statutory purpose as even Young and Volious conceive of it. The best reading of § 1716's plain language is therefore that an inert device qualifies as a nonmailable item if it contains explosives.

b.

Controlling case law also favors the government. Though few courts have examined § 1716(j) in this context, we did so in *United States v. Hamrick*, 43 F.3d 877 (4th Cir. 1995) (en banc). There, the defendant mailed a package bomb to a federal prosecutor. When the prosecutor opened the package, the bomb ignited, but didn't explode. *Hamrick*, 43 F.3d at 879. The defendant asserted that "since his bomb was dysfunctional, it was not a nonmailable article." *Id*. at 884.

Sitting en banc, we rejected that argument and determined that a reasonable jury could have found the defendant guilty under § 1716 because his package bomb contained "inflammable liquified butane" that could have "ignited" during transit.[3] *Id*. at 879. Although the *Hamrick* court didn't match its analysis to the statutory text explicitly, it's clear that the court determined that the package contained an "inflammable material" and the device in the package constituted a "device which may ignite," both of which are categories of items that § 1716 prohibits.

---

[3] The *Hamrick* court split evenly as to certain issues, but the § 1716 charge wasn't among them. As Judge Hamilton's concurring opinion makes clear, the court was unanimous in its view that the jury properly convicted the defendant of violating § 1716. *Hamrick*, 43 F.3d at 890 (Hamilton, J., concurring).

10

The distinctions that Young and Volious attempt to make between their case and *Hamrick* make no difference. First, it matters not that *Hamrick* concerned "inflammable materials" and this case concerns "explosives." In both cases, the packages at issue were nonmailable because they contained materials that § 1716 seeks to exclude from the mails.

It also makes no difference that the *Hamrick* defendant's bomb was intended to explode, whereas here the FBI designed the device to prevent that result. We held in *Hamrick* that "[a] finding that [the defendant's] bomb was capable of operating *as designed* is . . . unnecessary to support a conviction under section 1716." 43 F.3d at 884 (emphasis added). True, the bomb in this case operated precisely as it was designed, since it didn't detonate. But in *Hamrick*, the bomb designer and the bomb sender were the same person: the defendant. It therefore made sense in that case for the court to refer only to the bomb designer's intentions because no one else was involved in the plot. In the context of this case, we read *Hamrick* to mean that a conviction under § 1716(j)(2) doesn't require a finding that the bomb was capable of operating as the sender intended, so long as the package mailed contains something that § 1716(a) forbids. Since Young and Volious mailed a bomb they hoped would explode, and the package contained high explosives, this case is in line with our en banc precedent.

Young and Volious also cite *United States v. Wisdom*, 534 F.2d 1306 (8th Cir. 1976), to support their argument, but that case misses the mark. There, the defendant mailed a package bomb to another person, but the bomb didn't detonate when the recipient opened the box. *Wisdom*, 534 F.2d at 1308. The defendant argued that the package was a "hoax bomb" that he designed to look realistic, but not explode. The government, on the

11

other hand, presented evidence suggesting that the defendant meant to design a functional bomb, but made several mistakes that rendered the bomb dysfunctional during travel. *Id.* at 1308–09. Accordingly, the issue for the jury to decide was whether the defendant in fact intended to make a real bomb, not whether the bomb contained explosives. *See id.* at 1307 ("[T]he defendant admits that the package contained non-mailable material.").

This case has the opposite facts. No one disputes that Young and Volious intended to mail a real bomb that would have killed Young's ex-wife when she opened it—the only dispute concerns whether the package contained a nonmailable item. In short, *Wisdom* sheds little light on this case.

Since the government's reading of the statutory text is persuasive and *Hamrick*— the only controlling case law on the subject—supports that reading, we conclude that, as a matter of law, an inert bomb that contains explosives qualifies as a nonmailable item under § 1716.

2.

Young and Volious next argue that the jury improperly convicted them of aiding and abetting the mailing of a nonmailable item because the government failed to introduce enough evidence that the package Fears deposited for mailing actually contained any high explosives. On review, we must uphold the jury's conviction "if there is substantial evidence in the record to support it; that is, there must be evidence that a reasonable finder of fact could accept as adequate and sufficient to support the defendant's guilt." *United States v. Banker*, 876 F.3d 530, 540 (4th Cir. 2017) (cleaned up).

12

Young and Volious's theory is that, while the government introduced evidence that the inert device tested positive for high explosives before the FBI delivered it to Meredith's house, the FBI didn't retest the device after the agents recovered it from beside the mail deposit boxes. As a result, Young and Volious contend, a jury couldn't know whether the device that the FBI recovered contained high explosives and therefore couldn't properly convict them for aiding and abetting the mailing of a nonmailable item.

That argument lacks merit. The jury heard evidence that an FBI bomb specialist assembled an inert bomb after Young's dark web inquiry. An FBI chemist testified that he tested the inert bomb and determined that, while the device couldn't detonate, it contained high explosives that are "designed to detonate." J.A. 536–37.

The government then described a chain of custody that a jury could rely on to conclude that the bomb's chemical makeup never changed. A postal inspector personally delivered the package containing the inert bomb from FBI Headquarters in Quantico, Virginia to Meredith's house. Meredith received the box and then left it in his guest bedroom until Fears arrived. When Fears showed up, the two of them brought the box to the kitchen, followed the instructions to arm the bomb, and put the shipping label that Volious delivered onto the box. Fears then took the package containing the inert bomb to the mail deposit boxes, where he left it (and FBI agents recovered it). There's no evidence in the record that any person tampered with or altered the bomb at any point between when it left Quantico and when FBI agents recovered the package from beside the mail deposit boxes.

13

The record evidence is more than enough for a reasonable jury to conclude that Fears placed the same device that the FBI sent to Meredith next to the mail deposit boxes, and therefore more than enough to convict Young and Volious for aiding and abetting the mailing of a nonmailable item.

## B.

The jury also convicted Young and Volious of aiding and abetting the carrying of "an explosive during the commission of [a] felony," in violation of 18 U.S.C. § 844(h). Mailing a nonmailable item with intent to kill under § 1716(j) was the predicate felony. Young and Volious now make a single challenge to those convictions: that they can't be guilty of violating § 844(h) because they didn't violate § 1716(j). As already discussed, however, the law and the evidence at trial support their convictions under § 1716(j). Since their sole argument against their convictions for aiding and abetting the carrying of an explosive during the commission of a felony fails, we decline to disturb the jury's convictions.

## C.

Volious next argues that we should vacate his conviction for the conspiracy charged in count one because the indictment fatally varied from the evidence presented at trial.

When the government presents evidence that "broadens the bases for conviction beyond those charged in the indictment," a "variance" occurs. *United States v. Cannady*, 924 F.3d 94, 99 (4th Cir. 2019). But "[n]ot all variances between an indictment and the proof offered at trial are 'fatal.'" *Id.* A variance is fatal, and violates the Fifth Amendment right to be indicted by a grand jury, "only if the appellant shows that the variance infringed

14

his 'substantial rights' and thereby resulted in actual prejudice." *Id.* (quoting *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994)). We review de novo a defendant's challenge to his conviction based on a claim that a fatal variance occurred at trial. *United States v. Malloy*, 568 F.3d 166, 177 (4th Cir. 2009).

Volious argues that, while the government charged him with participating in a single conspiracy with two different objectives—dealing drugs and mailing a bomb to Young's ex-wife—the evidence at trial showed that there were, in fact, two separate conspiracies to accomplish those goals. Although a variance may have occurred at trial, we decline to overturn Volious's conviction because he hasn't shown that the variance actually prejudiced him.

A single conspiracy "exists where there is one overall agreement, or one general business venture," *United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005), even when that agreement or venture has multiple objects, *United States v. Bolden*, 325 F.3d 471, 492 (4th Cir. 2003) ("Courts have uniformly upheld multiple-object conspiracies . . . ."). As the Supreme Court has put it, "[a] single agreement to commit several crimes constitutes one conspiracy," but "multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Broce*, 488 U.S. 563, 570–71 (1989).

Our cases distinguish single conspiracies from separate, independent conspiracies "based on the overlap in actors, methods, and goals." *United States v. Bartko*, 728 F.3d 327, 344–45 (4th Cir. 2013); *United States v. Brown*, 811 F. App'x 818, 823 (4th Cir. 2020). The jury heard enough evidence to determine that the same actors—Young,

15

Meredith, Fears, and Volious—were involved in both the drug conspiracy and the bomb plot,[4] but the overlap largely ends there.

The methods of accomplishing the drug conspiracy and the mail bomb plot were different in important respects. While Young used a contraband cellphone to facilitate both criminal objectives from prison, Young contacted a new source to obtain the bomb and he used a new covert messaging application to coordinate the bomb's delivery with Fears. No evidence suggests that the drug dealing operation required Volious, Fears, or Meredith to reship any packages to other third parties. Nor did the drug dealing ever extend to Florida, where Young's ex-wife lived at the time and where she would have received the package containing the bomb. *See United States v. Jeffers*, 570 F.3d 557, 567 (4th Cir. 2009) (instructing courts to consider whether the two conspiracies have "the same geographic spread"). More importantly, the group's drug-dealing efforts never involved violence of any kind. *See id.* (instructing courts to consider whether the two conspiracies have "the same results").

---

[4] Although Volious argues that he wasn't involved in the bomb plot, *see* Appellants' Br. at 21–24 (citing testimony from Meredith and Young suggesting that Volious knew nothing about the bomb plot), the government presented evidence to the contrary, *see* Appellee's Br. at 6–7 (citing testimony from Fears that Volious delivered the shipping label to Fears with the knowledge that the package contained a bomb and was intended for Young's ex-wife). At the very least, Volious delivered the bomb's shipping label to Fears. And that's likely enough for the jury to have properly determined that Volious was involved in the bomb conspiracy. *See United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) ("[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence.").

The goals of the drug conspiracy and bomb plot were also different. One operated to make money by selling drugs and the other endeavored to murder someone with no connection to the drug activity, for free, with a mail bomb. As Volious argues, we generally recognize multiple-object conspiracies only when the conspiracies' objectives are at least somewhat similar to each other. *See, e.g.*, *Bartko*, 728 F.3d at 332, 344–45 (all conspired to conduct fraudulent financial scheme); *Brown*, 811 F. App'x at 823 (all conspired to sell and possess drugs); *Cannady*, 924 F.3d at 100 (same); *Jeffers*, 570 F.3d at 567 (same).

Nonetheless, even if the evidence at trial varied from the indictment's charge, Volious hasn't shown that such a variance prejudiced him. *Cannady*, 924 F.3d at 100 ("The defendant bears the burden of establishing a prejudicial variance."). "[T]o show actual prejudice stemming from a multiple conspiracy variance," Volious "must prove that there [were] so many defendants and so many separate conspiracies before the jury that the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." *Id.* (cleaned up).

Volious argues that the number of defendants on trial (four) and conspiracies at play (two) indicate that the jury likely transferred evidence of Young's complicity in both conspiracies to Volious. We disagree.

We've previously determined that potential variances in cases similar to, and even more complex than, this one didn't result in actual prejudice because they presented no risk of jury confusion. *See, e.g.*, *United States v. Kennedy*, 32 F.3d at 883 (no prejudice in case with eight defendants and three conspiracies); *United States v. Squillacote*, 221 F.3d 542, 575 (4th Cir. 2000) (finding no prejudice in a case with "a small number of conspirators

17

engaged in a limited number of illegal activities"). Indeed, even the cases that Volious cites suggest that any variance in this case wasn't prejudicial.[5]

Moreover, this case presents no unusually complex facts that might confuse a jury, or cause it to misunderstand the necessary facts, and then transfer evidence of guilt from one defendant to another. To the contrary, both potential conspiracies in this case are relatively simple and easy to understand. *See Squillacote*, 221 F.3d at 575 (no risk of jury confusion in part because the "case was relatively straightforward"). Since Volious hasn't demonstrated actual prejudice, any variance wasn't fatal and thus isn't cause for reversal.

D.

Volious next argues that the district court erred by failing to instruct the jury that it could determine that multiple conspiracies took place. Again, we disagree. We review a "district court's denial of a proposed jury instruction for abuse of discretion." *Cannady*, 924 F.3d at 101.

Courts need not give multiple conspiracy instructions "unless the proof at trial demonstrates that appellants were involved only in separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *Id.* Even in such cases, a court's failure to give a multiple conspiracy instruction is reversible only when "the evidence of multiple

---

[5] *Compare Berger v. United States*, 295 U.S. 78 (1935) (variance non-prejudicial in case with two conspiracies involving four defendants), *United States v. Caporale*, 806 F.2d 1487 (11th Cir. 1986) (variance non-prejudicial in case with two possible conspiracies involving 11 defendants), *and United States v. Jones*, 880 F.2d 55 (8th Cir. 1989) (variance non-prejudicial in case with five defendants and two conspiracies), *with Kotteakos v. United States*, 328 U.S. 750 (1946) (variance prejudicial in case with eight or more conspiracies involving 19 defendants).

18

conspiracies [was] *so* strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." *Bartko*, 728 F.3d at 344 (cleaned up).

Even if the evidence at trial showed that two conspiracies existed, there's no reason to believe that the jury would have acquitted Volious of the conspiracy count if the district court had given a multiple-conspiracy instruction. As charged, the indictment lists four objectives to the conspiracy: three relating to the bomb plot and one for "Distributing Controlled Substances." J.A. 89–90. Since Volious doesn't contest that he knowingly participated in Young's drug-dealing operation, a reasonable jury could have convicted him of the conspiracy count for that conduct, regardless of whether a separate conspiracy was afoot.

And even if the jury had been instructed that they could consider the drug conspiracy and bomb plots as separate conspiracies, it could have reasonably convicted Volious for participating in the bomb conspiracy. Some trial evidence indicated that Volious knew only about the drug ring (and not the bomb plot), but other evidence suggested that Volious delivered the shipping label to Fears with knowledge that Fears would use it to mail a dangerous package to Young's ex-wife. Since the jury could reasonably resolve that factual conflict in the government's favor, we conclude that the evidence in Volious's favor is not so strong that the jury likely would have acquitted him if the court had given his proposed multiple-conspiracy instruction. The court therefore didn't abuse its discretion in declining to give the instruction.

19

E.

Volious's final argument is that the district court erred by denying his pre-trial motion to sever his trial from Young's. In reviewing a district court's ruling on a motion to sever a criminal trial, we must first "determine if the initial joinder of the offenses and defendants was proper under Fed. R. Crim. P. 8(a) and 8(b) respectively." *Cannady*, 924 F.3d at 102. If so, "we must then determine if the district court abused its discretion under Fed. R. Crim. P. 14 in denying [the] pre-trial motion[] to sever." *Id.*

Federal Rule of Criminal Procedure 8(a) doesn't apply here because it pertains to joining offenses, rather than defendants. Rule 8(b) states that:

> The indictment or information may charge [two] or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b); *see also Cannady*, 924 F.3d at 102 ("Rule 8 permits very broad joinder at the pleading stage.") (cleaned up).

The indictment alleges that Volious and Young were involved in both the drug conspiracy and the mail bomb plot. Even assuming arguendo that Volious wasn't involved in the bomb plot, he still would have been a part of the same "series of transactions" that generated the indictment. And while Volious argues that the government misjoined him because he wasn't involved in Young's previous attempt on his ex-wife's life, that attempted murder isn't at issue here. This prosecution concerned the events that took place

20

after Young was tried and convicted for that crime. We therefore have no reason to believe that Volious and Young's initial joinder was improper.

If two defendants are properly indicted together, courts "generally adhere to the principle that defendants indicted together should be tried together, and a defendant must show that he was prejudiced by the denial of a severance motion in order to establish that the district court abused its broad discretion in that regard." *Cannady*, 924 F.3d at 102 (cleaned up); *see also United States v. Lawson*, 677 F.3d 629, 639 (4th Cir. 2012) (joint trials are "highly favored" in conspiracy cases). Demonstrating prejudice is a high hurdle. It exists "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

Volious identifies no specific trial right that the district court's decision compromised. Instead, he argues that he suffered prejudice because the government's main witness, Fears, wasn't credible. But Volious cites no authority that permits a district court to prejudge a trial witness's credibility when determining whether to sever a defendant from a joint trial. Volious also contends that joining the two trials "allowed the government to greatly bolster Fear[s]'s conspiracy testimony and, consequently, substantially strengthen [its] case both as to the conspiracy and substantive counts." Appellants' Br. at 33. But Volious was "not entitled to severance merely because he might have had a better chance of acquittal in a separate trial." *Cannady*, 924 F.3d at 103.

21

Here, Volious remained free to combat the government's "bolstering" of Fears's testimony by cross-examining Fears at trial and introducing evidence that conflicted with his account. He and Young indeed did so. And even if a joint trial created a more favorable environment for Fears's testimony, there's no indication that it did so to the extent that the jury was unable to render a reliable verdict. The district court therefore correctly denied the motion to sever.

## III.

For the reasons given, we affirm the district court's judgment.

*AFFIRMED*